FILED
United States Court of Appeals
Tenth Circuit

December 27, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KENDRICK ANTONIO SIMPSON,

     Petitioner - Appellant,

v.

MIKE CARPENTER, Interim Warden,[*]
Oklahoma State Penitentiary,

     Respondent - Appellee.

No. 16-6191

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:11-CV-00096-M)**
_____

Sarah M. Jernigan, Assistant Federal Public Defender (Patti Palmer Ghezzi, Assistant Federal Public Defender, with her on the briefs), Oklahoma City, Oklahoma, for Petitioner - Appellant.

Jennifer J. Dickson, Assistant Attorney General (Mike Hunter, Attorney General of Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for Respondent - Appellee.
_____

Before **LUCERO**, **HOLMES**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Mike Carpenter, current Interim Warden of Oklahoma State Penitentiary, is automatically substituted for Terry Royal, Warden (who was previously automatically substituted for Kevin Duckworth, Interim Warden), as Respondent in this case.

_____

Kendrick Simpson is a state prisoner in Oklahoma. After a bifurcated proceeding, the jury convicted Mr. Simpson of two counts of first-degree murder and sentenced him to death. He now appeals the district court's denial of his petition for federal habeas relief under 28 U.S.C. § 2254. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm.

## I. BACKGROUND

### A. *Factual History*

Pursuant to the Anti-Terrorism and Effective Death Penalty Act (AEDPA), we presume the factual findings of the Oklahoma Court of Criminal Appeals (OCCA) are correct, absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007). We therefore state the facts surrounding the murders as found by the OCCA on direct appeal:

> On the evening of January 15, 2006, Jonathan Dalton, Latango Robertson and [Mr. Simpson] decided to go to Fritzi's hip hop club in Oklahoma City. Prior to going to the club, the three drove in [Mr.] Dalton's white Monte Carlo to [Mr. Simpson's] house so that [Mr. Simpson] could change clothes. While at his house, [Mr. Simpson] got an assault rifle[,] which he brought with him.[1] Before going to Fritzi's, the men first went to a house party where they consumed alcohol and marijuana. When they left the party, [Mr. Simpson] put the assault rifle into the trunk of the Monte Carlo, which could be accessed through the back seat.
>
> The three arrived at Fritzi's between midnight and 1:00 a.m. on January 16. Once inside, they went to the bar to get a drink. [Mr. Simpson]

---

[1] There was testimony that this weapon was an AK-47 or SKS assault rifle.

2

and [Mr.] Dalton also took a drug called "Ecstasy." After getting their drinks, [Mr.] Dalton and [Mr.] Robertson sat down at a table while [Mr. Simpson] walked around. When [Mr. Simpson] walked by London Johnson, Anthony Jones and Glen Palmer, one of the three apparently said something to him about the Chicago Cubs baseball cap that he was wearing. [Mr. Simpson] went back to the table and told [Mr.] Dalton and [Mr.] Robertson that some guy had given him a hard time about his cap. At some point, [Mr. Simpson] approached [Mr.] Johnson, [Mr.] Jones and [Mr.] Palmer again. During this encounter, [Mr. Simpson] told them that he was going to "chop" them up.[2] After making this threat, [Mr. Simpson] walked away. He returned a short time later and walked up to Palmer. [Mr. Simpson] extended his hand and said, "We cool." [Mr.] Palmer hit [Mr. Simpson] in the mouth knocking him to the floor. [Mr. Simpson] told [Mr.] Dalton and [Mr.] Robertson that he wanted to leave and the three of them left the club.

Out in the parking lot, [Mr. Simpson], [Mr.] Dalton and [Mr.] Robertson went to [Mr.] Dalton's Monte Carlo. Before leaving, they talked with some girls who had come out of the club and were parked next to them. The girls told the men to follow them to a 7-[Eleven] located at NW 23rd Street and Portland. When they arrived at the store, [Mr. Simpson], [Mr.] Dalton and [Mr.] Robertson backed into a parking space toward the back door and the girls pulled in next to the pumps. While the men were sitting in the Monte Carlo, they saw [Mr.] Johnson, [Mr.] Jones and [Mr.] Palmer drive into the parking lot in [Mr.] Palmer's Chevy Caprice. They recognized [Mr.] Palmer as the person who had hit [Mr. Simpson] at Fritzi's. [Mr.] Dalton told [Mr. Simpson] to "chill out" but [Mr. Simpson] was mad and wanted to retaliate against [Mr.] Palmer. When [Mr.] Palmer drove out of the parking lot onto 23rd Street and merged onto I-44, [Mr. Simpson] told [Mr.] Dalton to follow them.

While they were following the Chevy, [Mr. Simpson], who was sitting in the front passenger seat, told [Mr.] Robertson, who was sitting in the back seat, to give him the gun. He told [Mr.] Robertson that if he had to get the gun himself, there was going to be trouble. [Mr.] Robertson reached through the back seat into the trunk and retrieved the gun for [Mr. Simpson]. [Mr.] Dalton followed the Chevy as it exited the interstate onto Pennsylvania Avenue. He pulled the Monte Carlo into the left lane beside

---

[2] [Mr.] Johnson testified at trial that this meant to him that [Mr. Simpson] was going to shoot at them with a "chopper[,]" which was an AK-47.

the Chevy as they drove on Pennsylvania Avenue and [Mr. Simpson] pointed the gun out his open window and started firing at the Chevy.

When the Chevy was hit with bullets, [Mr.] Palmer was driving, [Mr.] Jones was sitting in the front passenger seat and [Mr.] Johnson was in the back seat. [Mr.] Johnson heard about twenty rapid gun shots and got down on the floor of the car. He did not see the shooter but noticed a white vehicle drive up beside them. The Chevy jumped the curb and hit an electric pole and fence before coming to a stop. [Mr.] Palmer and [Mr.] Jones had been shot. [Mr.] Jones had been shot in the side of his head and torso and was unconscious. [Mr.] Palmer had been shot in the chest. He was initially conscious and able to talk but soon lost consciousness when he could no longer breathe. [Mr.] Johnson tried to give both [Mr.] Jones and [Mr.] Palmer CPR but was unsuccessful. He flagged down a car that was driving by and asked the driver to get help. Both [Mr.] Palmer and [Mr.] Jones died at the scene from their gunshot wounds.

After he fired at the Chevy, [Mr. Simpson] said, "I'm a monster. I just shot the car up." He added, "They shouldn't play with me like that." [Mr.] Dalton kept driving until they reached a residence in Midwest City where he was staying. They dropped the gun off and switched cars, and then [Mr.] Dalton, [Mr.] Robertson and [Mr. Simpson] went to meet some girls they had talked to at Fritzi's.

*Simpson v. State* (*Simpson I*), 230 P.3d 888, 893–94 (Okla. Crim. App. 2010) (footnotes in original).

## B.     *Procedural History*

## 1.  State Court Proceedings

### a.  *Criminal trial and sentencing*

The State of Oklahoma charged Mr. Simpson with the first-degree murders of Glen Palmer and Anthony Jones and with discharging a firearm with intent to kill London Johnson. *Id.* at 893.[3] The prosecution sought a penalty of death for each murder.

Prior to trial, Dr. Phillip Massad, a clinical psychologist, evaluated Mr. Simpson's mental condition. Mr. Simpson disclosed to Dr. Massad that, when Mr. Simpson was sixteen years old, a friend ambushed and shot him for refusing to kill a government witness scheduled to testify in the friend's criminal trial. Mr. Simpson suffered five gunshot wounds and spent two months hospitalized and comatose. Even after his release from the hospital, Mr. Simpson was readmitted frequently for treatment of complications arising from infections. He endured sixteen surgeries over a seven-month period, and feared his attackers would return to kill him. Dr. Massad concluded Mr. Simpson suffered from Post-Traumatic Stress Disorder (PTSD) as a result of the shooting.

Mr. Simpson's counsel notified the court he intended to present evidence of Mr. Simpson's PTSD and to call Dr. Massad as an expert witness on that topic. The defense planned to elicit testimony from Dr. Massad that Mr. Simpson suffered from PTSD and that this condition affected his ability to form the intent of malice aforethought required

---

[3] The State also charged Mr. Simpson with possession of a firearm after a former felony conviction, to which he pleaded guilty.

for a first-degree murder conviction. The State moved to exclude Dr. Massad from testifying at the guilt stage of trial. At a hearing on the matter, defense counsel represented that Dr. Massad would testify it was "possible that the PTSD affected [Mr. Simpson] to the extent that he was not able to form the specific intent" to kill, and that, because of his PTSD, Mr. Simpson would have "magnified in his own mind the threat" the victims presented. Trial Mot. Hr'g Tr. at 18 (Sept. 19, 2007). As the State notes, however, Dr. Massad's psychological report "never indicate[d] that [Mr. Simpson's PTSD] prevent[ed] him from forming an intent to kill" or from "know[ing] what he was doing was wrong." *Id.* at 11–12. The trial court granted the State's motion, holding that Oklahoma law precludes testimony that a defendant could not have formed the specific intent to commit a crime, except in the context of an intoxication or insanity defense, neither of which had been advanced by Mr. Simpson at that time.

The jury rendered its decision finding Mr. Simpson guilty of the first-degree murders of Mr. Palmer and Mr. Jones.[4] In the ensuing penalty stage, the State alleged four aggravating factors it claimed warranted a sentence of death:

> 1. [Mr. Simpson], prior to the time of sentencing, was convicted of a felony involving the use or threat of violence to [another] person [("Prior Violent Felony Aggravator")];

> 2. [Mr. Simpson] knowingly created a great risk of death to more than one person [("Risk of Multiple Deaths Aggravator")];

---

[4] The jury also found Mr. Simpson guilty of discharging a firearm with intent to kill Mr. Johnson.

3. The murder was especially heinous, atrocious, or cruel [("HAC Aggravator")];

4. At the present time there exists a probability that [Mr. Simpson] would commit criminal acts of violence that would constitute a continuing threat to society [("Continuing Threat Aggravator")].

Trial R. vol. 1 at 44. Mr. Simpson asserted three factors in mitigation: (1) his age,[5] (2) his mental state (PTSD diagnosis), and (3) his family support.

     i.     Aggravating evidence presented at sentencing

The State moved to incorporate all the evidence presented during the guilt stage and—after determining the evidence would be relevant to the HAC Aggravator, the Continuing Threat Aggravator, and the Risk of Multiple Deaths Aggravator—the court granted the motion.

In addition, Mr. Simpson stipulated that he had previously received a seven-and-a-half-year prison sentence for armed robbery, and the victim of that crime, Hung Pham, appeared in support of the State's case in aggravation. Mr. Pham testified that Mr. Simpson and two other men forced themselves into Mr. Pham's home at gunpoint. Mr. Pham provided compelling details, stating that Mr. Simpson shoved the gun in Mr. Pham's face, forced him inside, and beat him in the face and back with the gun. After taking Mr. Pham's wallet, Mr. Simpson pulled Mr. Pham into a bathroom closet, forced him to kneel on the floor, and demanded all of his money. When Mr. Pham replied that he did not have any more money, Mr. Simpson shot Mr. Pham in the head and left with

---

[5] Mr. Simpson was twenty-five at the time of the shooting.

Mr. Pham's wallet. Mr. Pham remembers the encounter vividly, "[b]ecause . . . [Mr. Simpson] hit my face, everything, he hurt me a lot. I remember forever." Trial Tr. vol. 7 at 96–97.

The State also relied on the testimony of Roy Collins, a jailhouse informant who had temporarily shared a cell with Mr. Simpson. Hoping to leverage a deal with the district attorney's office for his own early release, Mr. Collins asked Mr. Simpson about the murders. Mr. Collins testified that Mr. Simpson admitted to the altercation at Fritzi's, seeing the victims at the 7-Eleven, following them, and then firing the assault rifle into their car. Mr. Collins further stated that Mr. Simpson expressed no remorse for the murders and even tried to hire Mr. Collins to kill Mr. Johnson, the surviving victim, and to assault two pregnant women listed as State witnesses. Mr. Collins also testified that Mr. Simpson would smile and laugh when talking about the murders and that Mr. Simpson thought he was a "gangster[]" like "Tupac or Biggie Small." *Id.* at 47. Mr. Collins reported that Mr. Simpson "couldn't believe the victims' families were crying" because, according to Mr. Simpson, the victims "were gangbangers, that's the life they lived, that's the life they chose." *Id.* at 54–55. Mr. Collins also indicated that he could tell Mr. Simpson was a member of the Bloods gang because "[h]e's got red ink all over his neck." *Id.* at 58–59.

Finally, the prosecution presented victim impact statements from Rosalind Jones, the mother of Anthony Jones, and Tiarra Palmer, the sister of Glen Palmer.

ii.    Mitigating evidence presented at sentencing

The defense called six witnesses in mitigation: Dr. Massad, to testify about Mr. Simpson's PTSD diagnosis; Evan Gatewood, to impeach Mr. Collins; and Mr. Simpson's mother, grandmother, aunt, and ex-girlfriend, to testify about Mr. Simpson's upbringing and family support. The vast majority of the mitigating evidence focused on the ambush and shooting of Mr. Simpson and his long road to recovery. The witnesses indicated that family members visited Mr. Simpson every day in the hospital and that his mother believed "[h]e was on his dying bed." *Id.* at 153.

Dr. Massad testified that Mr. Simpson reported being "paranoid hostile" and hypervigilant as a result of having been shot. *Id.* at 190–92. Dr. Massad also testified at length about the basis of his diagnosis that Mr. Simpson suffered from PTSD and about the typical symptoms of the disorder. He explained that people suffering from PTSD "might be hypersensitive and overreact" to common situations. *Id.* at 166. Additionally, such a person could be "hypervigilant," constantly on "alert and watchful for danger," and could experience "exaggerated startle response[s] and other symptoms." *Id.* at 167. Dr. Massad further opined that drugs or alcohol could exacerbate this hypersensitivity and paranoia because they can "increase the likelihood that [a person] would react or overreact." *Id.*

Mr. Simpson's aunt highlighted examples of this paranoia and hypersensitivity in her testimony, noting Mr. Simpson was constantly terrified the men who had shot him would return and finish the job. He was "paranoid and scared" to the point he refused to

9

open the door when people came to visit, and he moved out of his mother's house because it was too close to the site of the shooting. *Id.* at 205–06.

Most of the testimony from Mr. Simpson's family focused on the family's love and support of Mr. Simpson. They gave limited detail about his childhood, characterizing him as a good child with a relatively normal upbringing. There was also testimony that Mr. Simpson's grandmother was primarily responsible for raising him, while his teenaged, single mother was finishing high school. The witnesses reported that Mr. Simpson's father was not involved in his upbringing and that Mr. Simpson dropped out of school in the eighth grade. The overall theme of the testimony was that Mr. Simpson had a good family who loved and supported him, but could not provide all the guidance required in raising him and his two siblings. Mr. Simpson's grandmother, mother, aunt, and ex-girlfriend all testified they would continue to support Mr. Simpson and would visit him in prison, if his life was spared.

Following the sentencing trial, the jury found all four aggravating factors by special verdict and recommended a sentence of death for each murder. The court adopted the jury's recommendation and sentenced Mr. Simpson to death.

b. *Appellate and post-conviction proceedings*

Mr. Simpson appealed his convictions and sentences, alleging a variety of errors in both the guilt and sentencing stages of his trial. On direct appeal, the OCCA affirmed Mr. Simpson's convictions and death sentences as to both Mr. Palmer and Mr. Jones. *Simpson I*, 230 P.3d at 907. Although the OCCA struck the HAC Aggravator for the death of Mr.

Jones, it concluded no constitutional error had occurred and no relief was warranted because the jury had not considered any evidence admitted solely due to the erroneous inclusion of that aggravating factor. *Id.* at 902–03.

Simultaneous with his direct appeal, Mr. Simpson filed an application for post-conviction relief and an application for an evidentiary hearing on whether he had received ineffective assistance of trial counsel. *Simpson v. State* (*Simpson II*), No. PCD-2007-1262 (Okla. Crim. App. Oct. 13, 2010) (unpublished). The OCCA denied both applications.

Three years later, Mr. Simpson filed a second state application for post-conviction relief, coupled with another application for an evidentiary hearing, in order to exhaust claims presented in his federal habeas petition. Again, the OCCA denied both applications. *See Simpson v. State* (*Simpson III*), No. PCD-2012-242 (Okla. Crim. App. Mar. 8, 2013) (unpublished).

## 2. Federal Court Proceedings

Mr. Simpson sought federal post-conviction relief by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, a motion for discovery, and a motion for an evidentiary hearing. *See Simpson v. Duckworth* (*Simpson IV*), No. CIV-11-96-M, 2016 WL 3029966, at *1 (W.D. Okla. May 25, 2016) (unpublished). The district court denied his petition and motions, but granted a Certificate of Appealability ("COA") on two of the eighteen grounds for relief: (1) the trial court's alleged improper exclusion of Mr.

11

Simpson's PTSD evidence from the guilt stage of the trial and (2) an alleged *Brady*[6] violation, whereby prosecutors withheld impeachment evidence as to Mr. Collins. This court subsequently granted a COA on five additional issues: (1) whether alleged prosecutorial misconduct denied Mr. Simpson a fundamentally fair sentencing proceeding; (2) whether a jury instruction and prosecutorial statements unduly limited jury consideration of mitigating evidence; (3) whether the HAC aggravating factor determination as to Mr. Palmer was unconstitutional and unreasonable; (4) whether trial counsel was ineffective for failing to investigate, prepare, and present lay witnesses, failing to request a second-degree murder instruction, failing to object to improper prosecutorial arguments, failing to object to the HAC instruction, and failing to object to the jury instruction limiting consideration of mitigating evidence; and (5) whether there was "cumulative error, limited to errors in the grounds on which a certificate of appealability has been granted."[7] Case Management Order dated December 1, 2016.

## II.    STANDARD OF REVIEW

AEDPA requires that we apply a "difficult to meet and highly deferential standard" in federal habeas proceedings under 28 U.S.C. § 2254; it is one that "demands

---

[6] *Brady v. Maryland*, 373 U.S. 83 (1963).

[7] Mr. Simpson filed a motion for modification of his COA, requesting appellate review of the trial court's ruling limiting mitigation testimony from De'Andrea Lagarde. We previously evaluated the merits of this claim and found it did not "deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). Mr. Simpson presents no compelling reason to depart from our previous holding on this issue, and we deny his motion.

that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks omitted). When a petitioner includes in his habeas application a "claim that was adjudicated on the merits in State court proceedings," a federal court shall not grant relief on that claim unless the state-court decision:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

Section 2254(d)(1)'s reference to "clearly established Federal law, as determined by the Supreme Court of the United States," "refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "Federal courts may not extract clearly established law from the general legal principles developed in factually distinct contexts, and Supreme Court holdings must be construed narrowly and consist only of something akin to on-point holdings." *Fairchild v. Trammell* (*Fairchild I*), 784 F.3d 702, 710 (10th Cir. 2015) (internal quotation marks omitted).

Under § 2254(d)(1), a state-court decision is "contrary to" the Supreme Court's clearly established precedent if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially

13

indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [that] precedent." *Williams*, 529 U.S. at 405–06. A state court need not cite, or even be aware of, applicable Supreme Court decisions, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

A state-court decision is an "unreasonable application" of Supreme Court law if the decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407–08. We undertake this "objective[] unreasonable[ness]" inquiry, *id.* at 409, in view of the specificity of the governing rule: "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations," *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Conversely, "[i]f a legal rule is specific, the range may be narrow" and "[a]pplications of the rule may be plainly correct or incorrect." *Id.* And "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. As a result, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"; "that application must also be unreasonable." *Id.* at 411.

Claims not "adjudicated on the merits" in state court are entitled to no deference. *Fairchild I*, 784 F.3d at 711. But, "even in the setting where we lack a state court merits determination, '[a]ny state-court findings of fact that bear upon the claim are entitled to a

14

presumption of correctness rebuttable only by "clear and convincing evidence."'" *Grant v. Royal*, 886 F.3d 874, 889 (10th Cir. 2018) (quoting 28 U.S.C. § 2254(e)(1)) (alteration in original), *petition for cert. filed sub nom. Grant v. Carpenter*, No. 18-6713 (Nov. 13, 2018); *see also Hooks v. Ward* (*Hooks I*), 184 F.3d 1206, 1223 (10th Cir. 1999) (presuming correctness of state court findings on claim not adjudicated on the merits). Although the burdens on the petitioner under AEDPA are significant, we "undertake this review cognizant that our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Fairchild v. Workman* (*Fairchild II*), 579 F.3d 1134, 1140 (10th Cir. 2009) (internal quotation marks omitted).

With these standards in mind, we turn to Mr. Simpson's claims.

### III.    DISCUSSION

As discussed, Mr. Simpson raises seven grounds for relief. We consider each of his arguments in turn.

### A.    *Right to Present a Complete Defense*

Mr. Simpson first asserts he is entitled to federal habeas relief with respect to his convictions because the trial court erroneously excluded expert testimony regarding his PTSD diagnosis and dissociative episodes from the guilt stage of trial. Mr. Simpson claims Dr. Massad's testimony was necessary to support the defense that his PTSD, standing alone or in conjunction with his intoxication defense, rendered him incapable of forming the specific intent to kill. According to Mr. Simpson, excluding this evidence violated his constitutional right to present a complete defense.

15

We begin our review of this claim by providing additional factual and procedural background. We then address the State's arguments that the claim is unexhausted and unpreserved.[8] Deciding that the PTSD portion of Mr. Simpson's claim is properly preserved and has been exhausted, we then examine the OCCA's merits decision. We conclude that decision is not unreasonable under § 2254(d)(1), and we therefore deny Mr. Simpson relief on this claim.

## 1. Additional Factual and Procedural Background

In reviewing this claim, the OCCA examined the transcript of the trial court hearing on the exclusion of the evidence and Dr. Massad's testimony during the sentencing stage of Mr. Simpson's trial. The OCCA concluded the trial court did not abuse its discretion by excluding this testimony from the guilt stage of trial because Dr. Massad could not say how Mr. Simpson's PTSD affected his ability to form the intent to kill. *Simpson I*, 230 P.3d at 895. As a result, the OCCA held that Mr. Simpson's PTSD diagnosis was "neither relevant to the intent element of the crime charged nor was it relevant to his defense of voluntary intoxication." *Id.*

On federal habeas review, Mr. Simpson challenges the OCCA's determination as both contrary to and an unreasonable application of clearly established federal law. The

---

[8] The State also claims that Mr. Simpson failed to adequately cite the record in his appellate brief as required by Federal Rule of Appellate Procedure 28(a)(8)(A). Although we agree that Mr. Simpson's record citations are inadequate, we exercise our discretion to resolve this issue on the merits. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (recognizing that the court has the discretion to overlook inadequate briefing and to consider an issue on the merits).

State counters that Mr. Simpson is barred from presenting this claim because he has failed to exhaust available state court remedies, he has forfeited the argument he makes on appeal by not presenting it to the district court, and, alternatively, because the OCCA's decision was neither contrary to federal law nor unreasonable.

## 2. Exhaustion and Preservation

We begin our analysis with the state's argument that Mr. Simpson failed to exhaust his claim that the trial court violated his right to present a complete defense . *See United States v. Miller*, 868 F.3d 1182, 1185 (10th Cir. 2017).

### a. *Legal standard*

AEDPA permits federal courts to entertain only those applications for a writ of habeas corpus alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may not grant such an application unless, with certain exceptions not relevant here, the applicant has exhausted state remedies before filing his petition. *Id.* § 2254(b)–(c); *see Pinholster*, 563 U.S. at 181. In general, to exhaust state remedies, a petitioner "must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *Thacker v. Workman*, 678 F.3d 820, 839 (10th Cir. 2012) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999)). This is accomplished by providing "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* (quoting *O'Sullivan*, 526 U.S. at 845). A claim is exhausted only after "it has been 'fairly

17

presented' to the state court." *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (quoting *Picard v. Connor,* 404 U.S. 270, 275 (1971)). "Fair presentation" requires that the substance of the federal claim was raised in state court. *Id.* "The petitioner need not cite 'book and verse on the federal constitution,' but the petitioner cannot assert entirely different arguments from those raised before the state court." *Id.* (quoting *Picard*, 404 U.S. at 278). Under this standard, Mr. Simpson's claim is unexhausted if the substance of the claim he is arguing here is different from the argument he made to the OCCA.

Turning to preservation, "[a] federal appellate court will not consider an issue not passed upon below." *F.D.I.C. v. Noel*, 177 F.3d 911, 915 (10th Cir. 1999) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). "Consequently, when a litigant fails to raise an issue below in a timely fashion and the court below does not address the merits of the issue, the litigant has not preserved the issue for appellate review." *Id.* To properly raise an argument below, a litigant must present the argument "with sufficient clarity and specificity." *Folks v. State Farm Mut. Auto. Ins. Co.*, 784 F.3d 730, 741 (10th Cir. 2015). To this point, "vague, arguable references to a point in the district court proceedings do not preserve the issue on appeal . . . because such perfunctory presentation deprives the trial court of its opportunity to consider and rule on an issue in any detail." *Id.* (citation and internal quotation marks omitted).

b. *Analysis*

Before this court, Mr. Simpson contends he suffers from dissociative episodes, and that his PTSD was the result of being shot by his friend and a lifetime of trauma. The

18

State asserts Mr. Simpson's claim is unexhausted and unpreserved because he is presenting an entirely different theory to this court than the theory he presented to the OCCA and the district court. The State further asserts Mr. Simpson has improperly supplemented his argument on appeal by relying on facts raised in conjunction with his ineffective assistance of counsel claim. Mr. Simpson disagrees, stating, "his argument throughout has been that his PTSD, not malice aforethought, is what caused him to react the way he did." Aplt. Reply Br. at 3–5. He further contends his claim is supportable even without the additional facts about his violent upbringing, and that the evidence of dissociative episodes is not new because the description of the phenomenon, if not the name itself, was presented to the OCCA.

For purposes of discussion, we divide Mr. Simpson's argument into two categories: (1) PTSD evidence and (2) evidence of dissociative episodes. We conclude that Mr. Simpson properly preserved and exhausted his PTSD argument, but that he failed to properly preserve his argument concerning dissociative episodes.

i. PTSD evidence

On direct appeal, Mr. Simpson argued his PTSD was the result of a single event— his having previously been ambushed and shot by his friend. Mr. Simpson further claimed his PTSD was "relevant to the issue of whether he shot with malice aforethought, or did so out of a sense of exaggerated fear and terror caused by his PTSD," which was exacerbated by his consumption of drugs and alcohol on the night of the murders. Aplt. Br. at 22–23, *Simpson I*, 230 P.3d 888 (No. D-2007-1055). Thus, Mr. Simpson posited

19

that evidence of his PTSD would have negated his ability to form the specific intent

necessary to commit first-degree murder. Finally, Mr. Simpson argued his PTSD was

relevant to support his voluntary intoxication defense.

Although Mr. Simpson's position in this court is more refined than the argument

he made to the OCCA, the core of his PTSD claim is the same. His assertion that the

OCCA's decision was "unreasonable based on [the OCCA and trial court's]

misunderstanding of PTSD" is not a new claim, but rather an attempt to bolster his

consistently-advanced position that his PTSD diagnosis was relevant as a defense during

the guilt stage of trial. *Compare* Aplee. Br. at 14–29, *with Simpson I*, 230 P.3d at 894–

95.[9] It is true that Mr. Simpson has presented this court with additional evidence to

support a diagnosis of trauma-related PTSD, but he also correctly notes that Dr. Massad

was aware of enough evidence before trial to diagnose Mr. Simpson with PTSD and in

---

[9] The OCCA described Mr. Simpson's claim as follows:

> Prior to trial, the defense filed a notice of intent to offer evidence of mental
> and/or psychological defect, deficiency, diminishment, and/or other such
> and related condition of defendant. Dr. Phillip Massad, a clinical
> psychologist, conducted a psychological evaluation of [Mr. Simpson] and
> issued a report in which he found it more likely than not that [Mr. Simpson]
> suffered from Post Traumatic Stress Disorder (PTSD). The state filed a
> motion to preclude the defense from offering testimony about [Mr.
> Simpson's] PTSD in the first stage of trial. A hearing was held on this
> motion and the trial court granted the State's motion. [Mr. Simpson]
> complains in his first proposition that this ruling was in error and violated
> his constitutional right to present a complete defense.

*Simpson v. State* (*Simpson I*), 230 P.3d 888, 894–95 (Okla. Crim. App. 2010).

20

fact did so. Thus, Mr. Simpson's claim that the symptoms of his PTSD—specifically the tendency to overreact—prevented him from forming the requisite intent to kill has been exhausted.

The State also asserts that Mr. Simpson has failed to preserve this claim on appeal by failing to raise it in the district court. The district court described Mr. Simpson's PTSD argument as follows:

> In Ground 2, [Mr. Simpson] asserts that he is entitled to habeas relief because the trial court prevented him from presenting evidence in the guilt stage that he suffered from Post Traumatic Stress Disorder (PTSD). [Mr. Simpson] argues that this evidence was relevant to the issue of intent and his voluntary intoxication defense, and that because he was unable to present this evidence, he was denied his constitutional right to present a complete defense.

*Simpson IV*, 2016 WL 3029966, at *6. Thus, Mr. Simpson advanced his PTSD argument before the district court. Accordingly, we reject the State's failure-to-preserve argument and determine Mr. Simpson's PTSD argument is properly before us.

ii. Dissociative episodes

In this court, Mr. Simpson also attempts to introduce a new defense related to, but qualitatively different than, the PTSD defense he raised before the district court. In his argument to this court, Mr. Simpson contends he "was in the midst of a PTSD and/or dissociative episode during the crime [, which] reveals his brain was functioning such that either he had a reduced capacity to form the specific intent of first-degree malice aforethought murder, or he was unable to form the intent at all." Aplt. Br. at 24. To be sure, Mr. Simpson argued to the district court that his PTSD, combined with his drug and

alcohol abuse, prevented him from forming the requisite mens rea. *See* Aplt. Br. at 14,

*Simpson IV*, 2016 WL 3029966 (No. CIV-11-96-M) (arguing that PTSD can cause

someone to "react out of an exaggerated sense of fear and terror uncontrolled by one's

will" and "that the level of intoxication necessary to negate the specific intent of first-

degree, malice aforethought murder is affected by PTSD"). But nowhere did he suggest,

before his argument here, that he suffered from a dissociative episode at the time of the

murders that rendered him "unable to form the intent at all." Accordingly, we agree with

the State that Mr. Simpson failed to preserve any claim that he was in a dissociative state

at the time of the murders.[10] We therefore confine our analysis of this claim to Mr.

Simpson's PTSD argument.

## 3. Merits

We turn now to the merits of Mr. Simpson's assertion that the trial court violated

his constitutional right to present a complete defense when it excluded evidence that his

PTSD made him hypervigilant and, together with his substance abuse on the night of the

murders, rendered him incapable of forming the requisite mens rea. *See Crane v.*

*Kentucky*, 476 U.S. 683, 690 (1986); *Washington v. Texas*, 388 U.S. 14, 18–19 (1967).

Mr. Simpson raises two distinct claims of error in this regard. First, he contends the trial

---

[10] Because we conclude Mr. Simpson failed to preserve this argument by not raising it in the district court, we do not address whether the claim was exhausted. *See Owens v. Trammell*, 792 F.3d 1234, 1246 n.8 (10th Cir. 2015) ("We do not reach the State's argument that Owens failed to exhaust his state court remedies because we base our decision on Owen's failure to raise the theory in the district court.").

court erred by refusing to allow him to present a defense theory that PTSD negated his ability to form the specific intent required for first-degree murder. Second, he argues evidence establishing that he suffered from PTSD was required to assist the jury in understanding the voluntary intoxication instruction.

   a. *OCCA decision*

The OCCA rejected both of these arguments on direct appeal, finding Dr. Massad's testimony irrelevant in both situations because he "could not testify as to how [Mr. Simpson's] PTSD could affect his intent at the time of the crime." *Simpson I*, 230 P.3d at 895. The OCCA decided this claim on the merits, thereby triggering AEDPA deference. According to Mr. Simpson, the OCCA's decision contradicted and unreasonably applied Supreme Court law.[11]

   b. *Reasonableness of the OCCA's legal determination*

The Supreme Court has recognized that although criminal defendants have the right to present a complete defense, they must still comply with a state's well-established rules of evidence. *See Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). Oklahoma law therefore informs our analysis.

   i.   <u>PTSD as a stand-alone defense</u>

As relevant to Mr. Simpson's first argument—that PTSD negated specific intent— the trial court correctly noted that Oklahoma permits diminished capacity evidence only

---

[11] Mr. Simpson does not assert the OCCA's decision was an unreasonable determination of the facts.

23

in the case of an intoxication or insanity defense. *Frederick v. State*, 37 P.3d 908, 931 (Okla. Crim. App. 2001). Mr. Simpson claims Oklahoma's rule is contrary to clearly established federal law because a diagnosis of PTSD is relevant in assessing whether the individual formed the specific intent necessary for first-degree murder. But Mr. Simpson fails to identify a single federal case, let alone a Supreme Court case, supporting his position.[12] Where there is no Supreme Court case on point, there is no clearly established federal law for the purposes of AEDPA. *See Hooks v. Workman* (*Hooks II*), 689 F.3d 1148, 1176 (10th Cir. 2012). And when a defendant "is unable to find any 'clearly established' Supreme Court precedent in support of [his] claim[,] . . . habeas relief is impossible to obtain." *Miller-El v. Cockrell*, 537 U.S. 322, 350 (2003). As such, Mr. Simpson's claim "fails at the threshold for lack of clearly established federal law." *Hooks II*, 689 F.3d at 1176.

    ii.    <u>PTSD as support for the intoxication defense</u>

Alternatively, Mr. Simpson argues the trial court erred by excluding Dr. Massad's testimony because it was necessary to assist the jury in evaluating Mr. Simpson's intoxication defense. The OCCA held that, because Dr. Massad's testimony was irrelevant, the trial court did not abuse its discretion in excluding it. *Simpson I*, 230 P.3d

---

[12] The only Supreme Court case addressing this issue actually undermines his claim. *See Clark v. Arizona*, 548 U.S. 735, 770–71 (2006) (upholding Arizona's exclusion of mental illness evidence offered to refute the mens rea element, unless such evidence is sufficient to establish an insanity defense).

at 895. This decision is reasonable under AEDPA unless no fairminded jurist could agree the evidence was irrelevant. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under Oklahoma law, evidence is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Okla. Stat. tit. 12, § 2401. And, "expert opinion testimony should be admitted only if it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Hooks v. State* (*Hooks III*), 862 P.2d 1273, 1278 (Okla. Crim. App. 1993) (quoting Okla. Stat. tit.12, § 2702). "When a defendant raises the defense of voluntary intoxication, an expert may properly offer his or her opinion on whether the defendant's actions were intentional." *Coddington v. State*, 142 P.3d 437, 450 (Okla. Crim. App. 2006). Thus, under *Coddington*, Dr. Massad "could have properly testified that, in his opinion and based upon his specialized knowledge, he believed [Mr. Simpson] would have been unable to form the requisite deliberate intent of malice aforethought." *See id.* But, "[w]here the normal experiences and qualifications of laymen jurors permit them to draw proper conclusions from the facts and circumstances, expert conclusions or opinions are inadmissible." *Hooks III*, 862 P.2d at 1279 (quoting *Gabus v. Harvey*, 678 P.2d 253, 256 (Okla. 1984)). The relevancy of Mr. Simpson's PTSD diagnosis, therefore, turns on whether Dr. Massad's testimony would have assisted the jury in determining whether Mr. Simpson's "intoxication affected his mental state and prevented him from forming malice aforethought." *See White v. State*, 973 P.2d 306, 311 (Okla. Crim. App. 1998). We have further explained that although, "psychological or

psychiatric evidence that negates the essential element of specific intent can be admissible[,] [t]he admission of such evidence will depend upon whether [it] . . . would negate intent rather than merely present a dangerously confusing theory of defense more akin to justification and excuse." *United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir. 2003).

A review of Dr. Massad's testimony fails to demonstrate any meaningful connection between PTSD and intent generally, or intoxication specifically. Even a generous reading of his testimony demonstrates only a bare assertion that Mr. Simpson had PTSD and that PTSD could cause one to be hypervigilant and to overreact to stimuli. Dr. Massad's testimony lacked any detail on the impact Mr. Simpson's PTSD had on his ability to form the intent to kill, and Dr. Massad's testimony on the interactive effects of PTSD and intoxicants is similarly lacking. Dr. Massad opined that PTSD could be affected by drugs and alcohol because they "could lower one's defenses and increase the likelihood that [the person] would react or overreact." Trial Tr. vol. 7 at 167. On cross-examination, however, Dr. Massad admitted he was "not sure about how the brain and alcohol interact" beyond generally lowering a person's inhibitions—which occurs regardless of "whether or not they have PTSD." *Id.* at 183. This is not the type of specialized knowledge beyond the "normal experiences and qualifications of laymen jurors." *See Hooks III*, 862 P.2d at 1279. And without more, this testimony falls within the "justification and excuse" evidence cautioned against in *Brown*, 326 F.3d at 1147.

Because a fairminded jurist could agree that Dr. Massad's testimony was irrelevant, the OCCA's decision was reasonable.

## B. Brady *Claim*

Mr. Simpson next alleges the prosecutors violated their constitutional responsibility under *Brady v. Maryland* to disclose all evidence favorable to the defense. Specifically, he contends the prosecution suppressed impeachment evidence against a State sentencing-stage witness, Roy Collins.

In addressing this claim, we begin with a discussion of what *Brady* requires. We then provide additional background relevant to the OCCA's decision, concluding that the OCCA did not resolve this claim on the merits. Instead, the OCCA held that Mr. Simpson waived his *Brady* claim by not bringing it on direct appeal or in his first state post-conviction application. We next consider whether Mr. Simpson can overcome that state procedural bar and conclude he cannot. As a result, we affirm the district court's denial of relief on this claim. Finally, we consider Mr. Simpson's request for discovery and an evidentiary hearing before the district court and we deny relief on that request, as well.

### 1. Elements of a *Brady* Claim

We have recognized three essential elements of a *Brady* claim: (1) the prosecutor suppressed the evidence; (2) the suppressed evidence was favorable to the accused, either because it is exculpatory or because it is impeaching; and (3) prejudice ensued because the suppressed evidence was material. *See Scott v. Mullin*, 303 F.3d 1222, 1230 (10th Cir. 2002); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("*Banks* (*Dretke*)") (quoting

27

*Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Evidence is suppressed for *Brady* purposes if the prosecution fails to disclose favorable exculpatory or impeachment evidence known either by it or the police, "irrespective of the good faith or bad faith of the prosecution."[13] *Wearry v. Cain*, 136 S. Ct. 1002, 1006–07 & 1007 n.8 (2016). "Favorable evidence 'is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

Here, Mr. Simpson claims the State suppressed three pieces of evidence (collectively, the "Collins Evidence"):

(1) a video-taped interview with Roy Collins from January 5, 2006, which reveals Mr. Collins's Hoover Crips gang affiliation and calls into question the veracity of his testimony concerning Mr. Simpson's jailhouse statements by revealing that Mr. Collins made nearly identical jailhouse statements about Jason Whitecrow, a defendant in an unrelated criminal trial;

(2) Mr. Collins's complete arrest, conviction, and incarceration records that reveal an additional four convictions to which Mr. Collins did not testify at trial; and

---

[13] Mr. Simpson's trial counsel asserted, and the State does not contest, that the State's "open file" did not include the Collins evidence. Counsel for the State also does not contest the Collins evidence was in the possession of the Oklahoma county district attorney's office at large.

28

(3) statements reflecting Mr. Collins's expectation of prosecutorial assistance in exchange for his testimony.

According to Mr. Simpson, the Collins Evidence was materially favorable *Brady* evidence that could have cast doubt on the credibility of Mr. Collins's testimony, which, in turn, was critical to support the Continuing Threat Aggravator. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *Douglas*, 560 F.3d at 1172–73. If Mr. Simpson can make this showing, "the prosecution's failure to disclose [the Collins Evidence] was harmful as a matter of law [and] 'there is no need for further harmless-error review.'" *See Banks v. Reynolds*, 54 F.3d 1508, 1522 (10th Cir. 1995) ("*Banks (Reynolds)*") (citation omitted) (quoting *Kyles*, 514 U.S. at 435); *see also Douglas*, 560 F.3d at 1173.

## 2. OCCA Decision

Mr. Simpson did not present his *Brady* claim to the OCCA until his second application for post-conviction relief. The OCCA held the claim was procedurally barred because the misconduct happened at trial, the legal basis for the claim was available on direct appeal and on the first post-conviction application, and "the factual basis for the claim[] was available and could have been ascertained through the exercise of reasonable diligence." *Simpson III*, slip op. at 4 (citing Okla. Stat. tit. 22, § 1089(D)). Specifically, the OCCA ruled Mr. Simpson's *Brady* claim had been waived. *Id.*

### 3. Procedural Default

#### a. *Independent and adequate procedural bar*

Under the doctrine of procedural default, "[c]laims that are defaulted in state court on adequate and independent state procedural grounds will not be considered by a habeas court . . . ." *Fairchild II*, 579 F.3d at 1141 (quotation marks omitted); *see also Martinez v. Ryan*, 566 U.S. 1, 9 (2012) ("[A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule."). "To be adequate, the [state] procedural ground must be strictly or regularly followed and applied evenhandedly to all similar claims." *Thacker,* 678 F.3d at 835 (internal quotation marks omitted). We have previously determined that Oklahoma's procedural default rule in title 22, section 1089(D) of the Oklahoma Statutes meets this requirement. *See, e.g., id.* at 835–36.

In turn, a state procedural rule is independent "if it relies on state law, rather than federal law, as the basis for decision." *Banks v. Workman*, 692 F.3d 1133, 1145 (10th Cir. 2012) (quotation marks omitted)). Here, the OCCA relied only on its state procedural rule, § 1089(D), to conclude that Mr. Simpson's *Brady* claim was waived. Thus, "we must recognize the OCCA's waiver ruling and treat the claim as procedurally barred for purposes of federal habeas review." *Thacker*, 678 F.3d at 836. Consequently, Mr. Simpson's *Brady* claim is precluded from federal habeas review unless he can overcome the default.

b. *Legal background on cause and prejudice*

"A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Martinez*, 566 U.S. at 10; *see also Fairchild II*, 579 F.3d at 1141.[14] To establish "cause," a petitioner must show that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Scott*, 303 F.3d at 1228 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Such objective factors include "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Id.* (quoting *Murray*, 477 U.S. at 488). A petitioner must also show "'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168 (1982); *see also Thacker*, 678 F.3d at 835. Because "cause and prejudice parallel two of the three components of the alleged *Brady* violation itself," *Strickler*, 527 U.S. at 282, if Mr. Simpson can successfully demonstrate cause and prejudice, he will have also succeeded in establishing his *Brady* claim, *see Banks (Dretke)*, 540 U.S. at 691; *see also Scott*, 303 F.3d at 1230 ("[W]e conclude that the . . . statements constitute *Brady* evidence that the prosecution had a duty to disclose to

---

[14] A petitioner may also obtain review of a procedurally defaulted claim by showing that a fundamental miscarriage of justice would occur if the merits of a claim are not addressed in the federal habeas proceeding. *See Fairchild v. Workman (Fairchild II)*, 579 F.3d 1134, 1141 (10th Cir. 2009). Mr. Simpson has not raised a fundamental miscarriage of justice challenge on appeal.

31

[petitioner]. Therefore [petitioner] has also established prejudice to overcome his procedural default."). We therefore address the *Brady* and procedural bar factors together.

Mr. Simpson must establish both cause and prejudice to overcome the state procedural bar, and we must reject his *Brady* claim if he fails to show either requirement. *See McCleskey v. Zant,* 499 U.S. 467, 502 (1991) ("As [petitioner] lacks cause for failing to raise the *Massiah* claim in the first federal petition, we need not consider whether he would be prejudiced by his inability to raise the alleged *Massiah* violation at this late date." (citing *Murray*, 477 U.S. at 494)); *see also Coleman v. Thompson*, 501 U.S. 722, 757 (1991) (holding petitioner's claim barred by state procedural default where petitioner could not establish cause, without considering prejudice); *Romano v. Gibson*, 239 F.3d 1156, 1171–72 (10th Cir. 2001) (assuming the State suppressed *Brady* evidence but denying relief because the evidence was not material).

We exercise our discretion to proceed directly to the prejudice/materiality question. Ultimately, we deny Mr. Simpson relief on his *Brady* claim because, even assuming he could show cause/suppression, he cannot establish prejudice/materiality.

c. *Prejudice/Materiality merits analysis*

"[P]rejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes." *Banks* (*Dretke*), 540 U.S. at 691. Suppressed evidence "is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *Kyles*, 514 U.S. at 433). "A 'reasonable probability' is a

32

'probability sufficient to undermine confidence in the outcome.'" *Scott*, 303 F.3d at 1230 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "In evaluating the materiality of withheld evidence, we do not consider each piece of withheld evidence in isolation. Rather we review the cumulative impact of the withheld evidence, its utility to the defense as well as its potentially damaging impact on the prosecution's case." *Banks* (*Reynolds*), 54 F.3d at 1518; *see also Snow v. Sirmons*, 474 F.3d 693, 711 (10th Cir. 2007). Put another way, "we evaluate the materiality of withheld evidence in light of the entire record in order to determine if 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Banks* (*Reynolds*), 54 F.3d at 1518 (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

Here, even if all the evidence Mr. Simpson claims is material had been disclosed, there is no reasonable probability the jury would have decided on a sentence less than death. *See Douglas*, 560 F.3d at 1173. The suppressed evidence includes: Mr. Collins's prior gang affiliation with the Hoover Crips—the same gang the victims belonged to and the rival of Mr. Simpson's gang, the Bloods; Mr. Collins's additional criminal convictions; the similarities between the two jailhouse confession stories; and Mr. Collins's alleged expectation of prosecutorial assistance in exchange for his testimony. To be sure, this evidence could have been used to impeach Mr. Collins, who testified in support of the Continuing Threat Aggravator. In evaluating prejudice/materiality, however, the impact of the evidence must be viewed in light of the impeachment

33

evidence introduced at trial and the strength of the State's aggravating evidence. *See*

*Banks* (*Reynolds*), 54 F.3d at 1518.

The only wholly new information withheld was Mr. Collins's prior gang affiliation

and the alleged similarities between Mr. Collins's story of his conversation with Mr.

Simpson and his prior testimony in the Whitecrow trial. All of the other Collins Evidence

related to topics on which evidence was introduced in some form at trial. For example,

the State conceded at trial that Mr. Collins wanted to exchange his testimony for

favorable treatment, but claimed it never agreed to such a deal. The State also admitted,

and the jury was informed, that Mr. Collins was a liar, a drug dealer, and a criminal, even

if the extent of those lies and crimes was not fully disclosed. In particular, the defense

established during trial that Mr. Collins lied on the stand about playing football at the

University of Oklahoma. It is true the prosecutor attempted to undermine the

effectiveness of this impeachment evidence by suggesting that, in Mr. Collins's "drug-

induced mind, he thinks he did [play football at the University of Oklahoma]." Trial Tr.

vol. 8 at 19. Nonetheless, the defense efforts at trial made the jury aware that Mr.

Collins's recollection of events was questionable at best. The introduction of evidence of

additional criminal convictions, or of more factual inaccuracies therefore, would have

had diminishing returns.

That said, when considering the suppressed evidence in light of the impeachment

evidence introduced at trial, we agree with Mr. Simpson that the suppressed evidence was

not all cumulative. *See Case v. Hatch*, 731 F.3d 1015, 1042–43 (10th Cir. 2013). As

34

indicated, Mr. Collins's gang affiliation and prior testimony about Mr. Whitecrow's alleged jailhouse admissions were not offered in any form at Mr. Simpson's trial. But that fact alone does not make the suppressed evidence material. To make that assessment, we must evaluate Mr. Collins's testimony in light of the State's case as a whole. *See Banks* (*Reynolds*), 54 F.3d at 1518.

As indicated, the State alleged four aggravating factors: 1) the Prior Violent Felony Aggravator, 2) the Risk of Multiple Deaths Aggravator, 3) the HAC Aggravator, and 4) the Continuing Threat Aggravator. Although defense counsel conceded the State had proven beyond a reasonable doubt the first two aggravating factors, counsel argued the State had failed to prove Mr. Palmer's death was especially heinous, atrocious, or cruel or that Mr. Simpson would continue to be a threat in jail. Trial Tr. vol. 8 at 46–47 ("[The prosecutor] told you that he has proven beyond a reasonable doubt all four of the aggravators. I will take issue with him on three and four. . . . [T]hey didn't prove three and four.").

The State relied on Mr. Collins's testimony to prove Mr. Simpson would be a continuing threat. *Id.* at 15 ("Now, this is where Roy Collins come[s] in. A continuing threat."); *id.* at 22 ("[W]e offered Roy Collins for continuing threat."). And Mr. Collins's extensive and inflammatory testimony may have been a factor in the jury's verdict of death. But the question is not whether Mr. Collins was beneficial to the prosecution; the question is whether the prosecutor's case was strong enough that, had the evidence impeaching Mr. Collins been disclosed, there is no reasonable probability the jury would

35

have decided on a sentence less than death. *See Douglas*, 560 F.3d at 1173. We believe it was.

Mr. Simpson characterizes Mr. Collins as critical to the State's case in aggravation, claiming, "[Mr.] Collins's testimony that Mr. Simpson tried to hire him to kill [the surviving victim] and assault and threaten witnesses and was utterly remorseless, was the centerpiece of the prosecution's case for death." Aplt. Br. at 53, 77–78. He argues the prosecutor "directed [Mr.] Collins to his theme that [Mr.] Simpson, a high rolling outsider from New Orleans, was a remorseless gangster." *Id.* at 53. While Mr. Simpson acknowledges there was other evidence to support the Continuing Threat Aggravator, he argues Mr. Collins's testimony was so important that the jury might not have imposed the death penalty without it. To put this argument in context, we must consider the other evidence offered in support of a penalty of death.

To begin, Mr. Simpson concedes there was sufficient evidence to support the jury's finding of the first two aggravators: (1) he was convicted previously of a felony involving the use or threat of violence and (2) he knowingly created a great risk of death to more than one person. There is also substantial evidence in the record that supported the Continuing Threat Aggravator, even without considering Mr. Collins's testimony.

First, the facts of the crime itself support this aggravator. *See Jones v. State*, 128 P.3d 521, 549–50 (Okla. Crim. App. 2006) ("Evidence of the callous nature of the crime and the defendant's blatant disregard for the importance of human life supports" the Continuing Threat Aggravator). Mr. Simpson gunned down three men with an assault

36

rifle because one of the victims had punched him nearly an hour earlier. He ordered one of his codefendants, Mr. Dalton, to follow the men for several miles and threatened Mr. Robinson, his other codefendant, when Mr. Robinson initially refused to retrieve the rifle from the trunk. The shooting took place in a residential area, yet Mr. Simpson indiscriminately shot fifteen to twenty rounds into the victims' moving car, forcing it to veer off the road and hit an electrical pole. And as he fled the scene, Mr. Simpson shouted, "I'm a monster. I'm a motherfucking monster. Bitches don't want to play with me."[15] Trial Tr. vol. 4 at 44–46.

The State also offered other evidence of Mr. Simpson's callous disregard for human life as support for finding the Continuing Threat Aggravator. For example, immediately following the murders, Mr. Simpson proceeded with his plan to visit some women he had met at Fritzi's. The jury could have reasonably inferred a lack of remorse from this conduct and weighed that attitude in favor of finding Mr. Simpson a continuing threat.

Mr. Simpson's attempts to conceal evidence further support a finding that he would be a continuing threat. The record reflects that Mr. Simpson threatened Mr. Dalton's family in an attempt to keep Mr. Dalton from speaking to the police, and that Mr. Simpson's codefendants took his threats seriously.

---

[15] This recitation of Mr. Simpson's statement immediately after the shooting is not identical to the sanitized version in the OCCA's findings. But for purposes of our analysis we rely on the trial transcript because it reflects the evidence as presented to the jury.

Mr. Simpson's past criminal convictions can also serve as evidence in support of the Continuing Threat Aggravator. *See Lockett v. State*, 53 P.3d 418, 428 (Okla. Crim. App. 2002). The State relied on Mr. Simpson's previous conviction for armed robbery and offered Mr. Pham's testimony about the facts underlying that offense. Mr. Pham related how Mr. Simpson forced his way into Mr. Pham's home, threatened him with a gun, beat him across the face and back, stole his wallet, forced him onto his knees, and then shot him in the head. Mr. Pham provided powerful evidence supporting a finding that Mr. Simpson would be a continuing threat.

Weighing all of the aggravating evidence the State introduced against the previously discussed evidence Mr. Simpson presented in mitigation,[16] we find no reasonable probability that the outcome of the sentencing proceeding would have been different had the Collins Evidence been produced. We do not discount the obvious significance of Mr. Collins's testimony or the State's reliance on it. But given the defense's successful, if admittedly limited, impeachment of Mr. Collins and the compelling nature of the State's other aggravating evidence, Mr. Simpson "has not convinced us that there is a reasonable probability that the jury would have returned a different verdict if [Mr. Collins's] testimony had been [further] impeached or excluded

---

[16] See Section I.B.1.a.ii, *supra*, for a detailed discussion of the mitigating evidence Mr. Simpson presented.

entirely." *See Strickler*, 527 U.S. at 296. Therefore, the evidence was not material under *Brady*, and Mr. Simpson cannot demonstrate prejudice.[17]

In summary, because Mr. Simpson cannot establish prejudice, we need not consider whether he could show cause. *See McCleskey*, 499 U.S. at 502. In the absence of a showing of both cause and prejudice, Mr. Simpson cannot overcome the state procedural bar and we cannot consider this claim on habeas review. Accordingly, we deny Mr. Simpson relief on his *Brady* claim.

---

[17] Mr. Simpson also claims the prosecutor violated his duty under *Napue v. Illinois*, 360 U.S. 264, 269–70 (1959), "not [to] solicit[] false evidence" and "to correct what he knows to be false and elicit the truth," by guiding Mr. Collins into misleading testimony about his education, criminal history, and motivation for testifying, and by knowingly failing to correct false testimony about Mr. Collins's football career at the University of Oklahoma. Like with his *Brady* claim, Mr. Simpson's *Napue* claim is procedurally defaulted. Thus, before we can consider the merits of Mr. Simpson's *Napue* claim, he must satisfy the cause and prejudice standard. But Mr. Simpson is unable to demonstrate prejudice because, for the reasons the *Brady* evidence was not material, he cannot demonstrate that the prosecutor's failure to correct false statements in Mr. Collins's testimony "not merely . . . created a *possibility* of prejudice, but that [it] worked to his *actual* and substantial disadvantage, infecting [his] entire trial with error of constitutional dimensions." *See Daniels v. United States*, 254 F.3d 1180, 1192 (2001) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). In so concluding, we acknowledge the anomaly in that the prejudice standard for prevailing on the merits of a *Napue* claim is lower than the prejudice standard for overcoming the procedural bar. *See United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015) ("Under *Napue* materiality is easier to establish [than under *Brady*]; the failure to disclose is material unless it was harmless beyond a reasonable doubt."). But, we also observe that where Mr. Simpson never identifies or advances an argument, to this court, under the lower prejudice standard for *Napue* claims, we will not consider any argument in favor of substituting the *Napue* prejudice standard for the prejudice standard to overcome the procedural bar.

## 4. Evidentiary Hearing and Discovery Motions

In conjunction with his *Brady* claim, Mr. Simpson appeals the district court's denial of his motion for an evidentiary hearing and discovery seeking additional impeachment evidence as to Roy Collins. The district court denied the motion after determining that Mr. Simpson "would not be entitled to relief even if Mr. Collins'[s] testimony was completely discounted or excluded." *Simpson IV*, 2016 WL 3029966, at *41. We review a district court's denial of a motion for discovery or an evidentiary hearing for abuse of discretion. *See Fairchild II*, 579 F.3d at 1147 (evidentiary hearing standard); *Wallace v. Ward*, 191 F.3d 1235, 1245 (10th Cir. 1999) (motion for discovery standard).

Generally speaking, federal habeas review "is 'limited to the record that was before the state court that adjudicated the claim on the merits.'" *Smith v. Aldridge*, 904 F.3d 874, 886 (10th Cir. 2018) (quoting *Pinholster*, 563 U.S. at 181). As a result, "we can only order evidentiary hearings if the petitioner meets the requirements in *both* §§ 2254(d) and (e)(2)." *Id.*

Here, where the OCCA did not explicitly reach the merits of Mr. Simpson's *Brady* claim, it is questionable whether § 2254(d) applies to his request for an evidentiary hearing. *See* 28 U.S.C. § 2254(d) ("An application for a writ of habeas corpus . . . shall not be granted with respect to any claim *that was adjudicated on the merits* in State court proceedings unless *the adjudication of the claim* . . . ." (emphasis added)). But because Mr. Simpson cannot satisfy either the § 2254(e)(2) requirements or the pre-AEDPA

requirements where § 2254(e)(2) does not apply, we need not determine the applicability

of § 2254(d) to a request for an evidentiary hearing where the state court did not

explicitly adjudicate a claim on the merits.

Section 2254(e)(2) of Title 28 states:

> If the applicant has failed to develop the factual basis of a claim in State
> court proceedings, the court shall not hold an evidentiary hearing on the
> claim unless the applicant shows that--
> > (A) the claim relies on--
> > > (i) a new rule of constitutional law, made retroactive to cases
> > > on collateral review by the Supreme Court, that was
> > > previously unavailable; or
> > > (ii) a factual predicate that could not have been previously
> > > discovered through the exercise of due diligence; and
> > (B) the facts underlying the claim would be sufficient to establish by
> > clear and convincing evidence that but for constitutional error, no
> > reasonable factfinder would have found the applicant guilty of the
> > underlying offense.

Under this provision, "AEDPA . . . bars an evidentiary hearing for a nondiligent

petitioner unless the petitioner can satisfy *both* §§ 2254(e)(2)(A) *and* (B)." *Pinholster*,

563 U.S. at 209–10 (emphasis added).[18] However, "[i]f the prisoner did not fail to

develop the factual basis for his claim in State court, § 2254(e)(2) is not applicable and a

federal habeas court should proceed to analyze whether an evidentiary hearing is

appropriate or required under pre-AEDPA standards." *Barkell v. Crouse*, 468 F.3d 684,

---

[18] To the extent our pre-*Pinholster* decisions state a petitioner meets the standard for an evidentiary hearing under § 2254(e)(2) by satisfying "2254(e)(2)(A) *or* (B)," *see Bryan v. Mullin*, 335 F.3d 1207, 1214 (10th Cir. 2003) (en banc) (emphasis added), *see also Cannon v. Mullin*, 383 F.3d 1152, 1176 (10th Cir. 2004), *Pinholster* resolves any ambiguity in the statute by clearly requiring the petitioner to satisfy *both* 2254(e)(2)(A) *and* (B).

693 (10th Cir. 2006) (quotation marks omitted). Under this pre-AEDPA standard, a petitioner is entitled to an evidentiary hearing "if (1) the facts were not adequately developed in state court, so long as that failure was not attributable to the petitioner, and (2) his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Id.* at 696 (quotation marks omitted); *see Medina v. Barnes*, 71 F.3d 363, 366 (10th Cir. 1995) (pre-AEDPA case stating that petitioner entitled to evidentiary hearing if he made "allegations which, if proved, would entitle him to relief"). Similarly, Mr. Simpson is entitled to discovery if he establishes "good cause," *Wallace*, 191 F.3d at 1245. "Good cause is established 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.'" *Id.* (quoting *Bracy v. Gramley,* 520 U.S. 899, 908–09 (1997)).

For the reasons explained above, Mr. Simpson cannot show that the jury would have given him a sentence less than death even with the additional impeachment evidence against Mr. Collins. Accordingly, Mr. Simpson has not satisfied § 2254(e)(2)(B) or the pre-AEDPA standard where § 2254(e)(2) does not apply because the petitioner acted diligently in the state court.[19] The district court therefore properly denied his motion for discovery and an evidentiary hearing.

---

[19] Because Mr. Simpson cannot satisfy either standard, we need not decide whether the OCCA reached an unreasonable determination when it concluded that "the factual basis for the [*Brady*] claim[] was available and could have been ascertained

## C.        *Consideration of Mitigating Evidence*

Mr. Simpson next claims the trial court's instruction and the prosecutor's improper argument unconstitutionally limited the jury's consideration of his mitigating evidence. On direct appeal, the OCCA denied relief, rejecting both prongs of Mr. Simpson's argument. *Simpson I*, 230 P.3d at 903–04.[20]

We begin our review of this claim with a general overview of the legal background. Next, we examine the OCCA's decision and conclude it adjudicated this issue on the merits. Accordingly, we proceed to the question of whether the OCCA unreasonably applied clearly establish law or unreasonably determined the facts. Under AEDPA's deferential standard of review, we deny relief on this claim.

---

through the exercise of reasonable diligence." *Simpson III*, slip op. at 4 (citing Okla. Stat. tit. 22, § 1089(D)).

[20] The State asserts Mr. Simpson "never raised a prosecutorial misconduct claim to the OCCA, or to the district court, regarding the prosecutor's arguments relating to his mitigation evidence" and that he was not granted a COA on this issue. Aplee. Br. at 79–80. We disagree. *See Simpson I*, 230 P.3d at 903–04 ("[T]his Court recognized that while the instruction on mitigating evidence did not unconstitutionally limit the evidence the jury could consider as mitigating, it was subject to misuse by prosecutors in closing argument. *This is what [Mr. Simpson] argues happened in the present case.*" (emphasis added) (footnote omitted)); Case Management Order dated December 1, 2016, at 1–2 (granting COA on "Ground II, Oklahoma's jury instruction defining mitigating circumstances is unduly limiting; moreover, the prosecutors exploited the instruction to blunt or eliminate jury consideration of important mitigating evidence, all in violation of the Sixth, Eighth, and Fourteenth Amendments.").

## 1. Legal Background

"The Supreme Court has repeatedly held that the Constitution requires that a jury 'cannot be precluded from considering, as a *mitigating factor,* any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" *Hanson v. Sherrod*, 797 F.3d 810, 850 (10th Cir. 2015) (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 110 (1982)); *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion). This is true regardless of whether the preclusion results from the jury instruction itself or from prosecutorial argument. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261 (2007); *see also Mills v. Maryland*, 486 U.S. 367, 375 (1988). But prosecutorial misrepresentations "are not to be judged as having the same force as an instruction from the court" and must be considered "in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 384–85 (1990). When evaluating whether a jury was unconstitutionally precluded from considering mitigating evidence, "[t]he proper inquiry is 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Hanson*, 797 F.3d at 850 (quoting *Boyde*, 494 U.S. at 380).

## 2. OCCA Decision

On direct appeal, Mr. Simpson argued that the instruction on mitigating evidence, combined with the prosecutor's improper argument, unconstitutionally prevented the jury from considering relevant evidence in mitigation. The OCCA rejected this claim on the merits, stating: "A review of the prosecutor's closing argument concerning the mitigating

evidence instruction, the mitigating evidence itself and all instructions concerning mitigation evidence given in this case supports our conclusion that the jurors' consideration of the evidence offered in mitigation was not unfairly limited in this case." *Simpson I*, 230 P.3d at 904. Because the OCCA adjudicated Mr. Simpson's claim on the merits, our review is limited by AEDPA, and we must affirm unless the OCCA's decision was contrary to or an unreasonable application of clearly established Supreme Court authority or based on an unreasonable determination of the facts in light of the evidence presented at trial. *See* 28 U.S.C. § 2254(d).

### 3. Reasonableness of the OCCA Decision

#### a. *Mitigation instruction*

Mr. Simpson first claims the language of Oklahoma's uniform jury instructions improperly precluded the jury from considering evidence that did not "extenuate or reduce the degree of [his] moral culpability or blame." Aplt. Br. at 80–81. We rejected this exact challenge in *Hanson*, and we must do so again today.

In *Hanson*, this court considered the constitutionality of the same instruction used in Mr. Simpson's case: "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." 797 F.3d at 850–51; Trial R. vol. 3 at 604. Relying on the Supreme Court's edict that jury instructions must be looked at in context rather than in isolation, *Boyde*, 494 U.S. at 378, we concluded that the second sentence in the

45

instruction "broadened any potential limitations imposed by the first sentence," *Hanson*, 797 F.3d at 851. And where, as is true here, the instruction is coupled with another instruction enumerating the defendant's asserted mitigating factors and informing the jury it "may decide that other mitigating circumstances exist, and if so, [it] should consider those circumstances as well," we concluded that there is no reasonable likelihood the jury would have felt precluded from considering any mitigating evidence. *Id.* Mr. Simpson has pointed us to nothing that would permit us to depart from this binding precedent.

   b.  *Prosecutor's closing argument*

   More compelling is Mr. Simpson's assertion that the prosecutor made improper comments designed to mislead the jurors into believing they could not legally consider Mr. Simpson's mitigating evidence unless it reduced his moral culpability or blame. Throughout his closing argument, the prosecutor made no less than nine separate statements which either generally defined mitigating evidence as reducing moral culpability or blame or specifically compared Mr. Simpson's mitigating factors to that definition ("Moral Culpability Comments").[21] One example of this came near the end of closing argument as the prosecutor was summarizing Mr. Simpson's mitigating evidence:

---

[21] Mr. Simpson relies on the Moral Culpability Comments to support two of his arguments: (1) the jury's consideration of his mitigating evidence was unconstitutionally limited, and (2) prosecutorial misconduct rendered his sentencing trial fundamentally unfair. There is some overlap in these arguments, but the two are distinct claims arising under different constitutional standards. In this section, we address only Mr. Simpson's claim that the prosecutor's Moral Culpability Comments improperly limited the jury's consideration of his evidence in mitigation. We address Mr. Simpson's separate argument

There is not one bit of mitigating evidence that reduces [Mr. Simpson's] degree of moral culpability. *That's what the law is. Does [the] mitigating circumstance reduce his degree of moral culpability or blame?*

Look at [the instruction]. Not one bit. Not his age, not his family, certainly not them. They're good people. They don't want to be here. He brought them into it, too.

And his mental condition, there's nothing wrong with him. There's not one bit of evidence that reduces his degree of moral culpability or blame. And [Dr. Massad] didn't tell you that, even if for some reason the P.h.D. [sic] convinces you, okay, he's got Post-Traumatic Stress, how does that reduce his degree of blame?

Trial Tr. vol. 8 at 31 (emphasis added). The record is replete with similar Moral Culpability Comments.[22] But we are constrained by AEDPA's deferential standard from providing relief to Mr. Simpson on this basis.

Several cases guide our analysis of this issue. In *Boyde*, the Supreme Court held a prosecutor's statements, that "the mitigating evidence did not 'suggest that petitioner's crime is less serious or that the gravity of the crime is any less' and that 'nothing I have heard lessens the seriousness of this crime,'" were not improper attempts to narrow the jury's consideration of mitigating evidence. 494 U.S. at 385. The Court concluded the prosecutor was merely arguing that "the evidence did not sufficiently mitigate Boyde's conduct[;] [the prosecutor] never suggested that the background and character evidence could not be considered." *Id.* (internal quotation marks omitted). The Court noted,

---

that the Moral Culpability Comments denied him a fundamentally fair sentencing trial in section III.D.4.a.

[22] Numerous additional examples are provided in footnotes 23-27.

however, that other comments by the prosecutor "explicitly assumed that [Mr. Boyde's] character evidence was a proper factor in the weighing process" and the defense attorney "also stressed a broad reading of [the instruction] in his argument to the jury." *Id.* at 385–86. Similarly, we held in *Hanson* that the prosecutor's statement that the jury should "consider whether any of the mitigating circumstances 'really extenuate or reduce Hanson's degree of culpability or blame,'" did not limit the jury because the prosecutor followed with other comments that "encouraged [the jurors] to consider any and all mitigating evidence they thought relevant." *Hanson*, 797 F.3d at 851.

Although these decisions are informative, Mr. Simpson's case has some key distinctions. The prosecutor began his discussion of Mr. Simpson's mitigating evidence by advancing an improperly narrow definition of mitigating evidence[23] as "what the law is." Trial Tr. vol. 8 at 31. He then systematically and repeatedly attacked Mr. Simpson's

---

[23] "Now, mitigating evidence. . . . Mitigating evidence, mitigating circumstances are those which in fairness and mercy and sympathy may extenuate or reduce the degree of moral culpability or blame. Does that make sense? Mitigating evidence presented is that which reduces the degree of moral culpability or blame for the murder." Trial Tr. vol. 8 at 23.

age,[24] mental state,[25] and family support,[26] both individually and collectively,[27] as failing to meet that definition. While a prosecutor may "comment[] on the weight that should be accorded to the mitigating factors," he cannot preclude the jury from "giving effect to the mitigating evidence" or "suggest that the jury was not permitted to consider the factors."

---

[24] "How in the world does his age reduce his degree of moral culpability or blame for this murder? It doesn't." Trial Tr. vol. 8 at 24.

[25] Mr. Simpson challenges three of these statements:

[1] "Even if somehow you find that, okay, more likely than not he's got Post-Traumatic Stress, that's not an excuse. Judge Gray didn't tell you that's an excuse. Judge Gray didn't say that prevents the imposition of the death penalty. Not at all. It's just something he's trying to hide behind . . . ." Trial Tr. vol. 8 at 29.

[2] "And now it's, 'Okay. Well, it's a mitigating factor that I've got PTSD.' You get back to the room and you say, 'How in the world does that reduce his degree of moral culpability or blame for this case?' It doesn't. It doesn't." Trial Tr. vol. 8 at 32.

[3]     "Let's talk about the mitigators. Mitigating circumstances are those which in fairness, sympathy, and mercy may extenuate or reduce the degree of moral culpability or blame. Ask yourselves, does this Defendant have PTSD? If he does, does it reduce the degree of moral culpability or blame? I would submit to you, no way. Not even close. First of all, I would submit to you he doesn't have PTSD. But if he does, there's no way it reduces the degree of his moral culpability and blame." Trial Tr. vol. 8 at 61.

[26] "How in the world does hiding behind his family support reduce his degree of moral culpability or blame?" Trial Tr. vol. 8 at 25.

[27] Mr. Simpson identifies two such statements:

[1] "Now, they presented mitigating evidence that they've alleged in Instruction Number 14. And you've got to ask yourselves how in the world does this evidence reduce his degree of moral culpability or blame." Trial Tr. vol. 8 at 24.

[2] "Look at his mitigating evidence and ask yourselves, how in the world does that reduce his blame for this incident? It doesn't. It's not even close." Trial Tr. vol. 8 at 33.

*Fox v. Ward*, 200 F.3d 1286, 1299–1300 (10th Cir. 2000). The prosecutor's argument here attempts to do just that. Unlike the prosecutors in *Hanson* and *Boyde*, the prosecutor here made no comments encouraging the jury to consider all the factors in mitigation and, instead, ended his closing argument by again asserting that Mr. Simpson's mitigating evidence did not reduce his culpability or blame. And neither the trial court nor defense counsel corrected the impression created by the comments. The closest defense counsel came to refuting the prosecutor's attempts to limit what the jury could consider as mitigating evidence was counsel's statement: "Hypervigilance, fear, and the responses to those are part of the PTSD disorder, Post-Traumatic Stress Disorder. And it is something that you can consider." Trial Tr. vol. 8 at 45.

Mr. Simpson's case is closer to our recent decision in *Grant*. As in Mr. Simpson's case, an Oklahoma jury convicted Mr. Grant of murder and then sentenced him to death. *See Grant*, 886 F.3d at 887. During Mr. Grant's sentencing trial, the jury received the same instruction defining mitigating circumstances as "extenuat[ing] or reduc[ing] the degree of moral culpability or blame" as at issue here. *See id.* at 930 (internal quotation marks omitted). The defense presented evidence of Mr. Grant's "mental illness" and "disadvantaged and dysfunctional childhood" as mitigating evidence, *id.* at 918, and argued that it provided "an explanation" for the defendant's actions even though it did not "excuse what happened," *id.* at 936–37.

In rebuttal, the prosecutor emphasized the limiting language of the mitigating instruction by telling the jury, "the law tells you what [the definition of mitigating

50

circumstances] means. . . . It says that mitigating circumstances are those which reduce the moral culpability or blame of the defendant. That those things, in order to be mitigating, must reduce his moral culpability or blame." *Id.* at 937 (emphasis omitted). After the trial court overruled an objection by the defense, the prosecutor in *Grant* pressed further, saying "the law says, not [what the prosecutor says], not what the defense attorneys say, but what the [c]ourt tells you and what the law says is that before something can be mitigating[,] it must reduce the moral culpability or blame of the defendant." *Id.* (emphasis omitted). The prosecutor then argued that Mr. Grant's mental illness did not reduce his moral culpability or blame and implied it therefore could not be mitigating because the jury "ha[d] to look at whether or not [Mr. Grant's mental illness] reduces his moral culpability or blame. That is what the law says that you must do." *See id.* (emphasis omitted).

Mr. Grant appealed to the OCCA, arguing "that the prosecutor focused on only one part of the definition of mitigating evidence, and thus unfairly limited the jurors' consideration of the evidence he had offered as mitigating." *Id.* at 931 (internal quotation marks omitted). The OCCA rejected this "dual challenge," holding that "the jurors in this case were properly instructed that anything could be considered mitigating." *Id.* (internal quotation marks omitted). In his § 2254 petition, Mr. Grant again argued that the jury was precluded from considering proper mitigation evidence by the language of the instruction and the prosecutor's "exploitation" of it. *Id.* at 935 (internal quotation marks omitted). Much like this case, the prosecutor in *Grant* presented the jury with a narrow definition

51

of mitigating evidence, characterized that definition as "what the law says," and then argued the specific evidence presented by the defense failed to meet that definition. *See id.* at 937 (internal quotation marks omitted). We ultimately concluded that, even considering the combined impact of the prosecutor's comments and the instruction, Mr. Grant could not overcome the OCCA's decision under the deferential standard of review required by AEDPA. *Id.* at 939. We reach a similar conclusion here.

Despite the pervasive nature of the prosecutor's Moral Culpability Comments in Mr. Simpson's case, the OCCA concluded the jury's consideration of the evidence was "not unfairly limited" by "the prosecutor's closing argument concerning the mitigating evidence instruction, the mitigating evidence itself and all instructions concerning mitigating evidence." *Simpson I*, 230 P.3d at 904. Under AEDPA's deferential standard of review, we uphold the OCCA's decision. To be sure, Mr. Simpson's case evidences significant and troubling prosecutorial comments that, standing alone, might violate federal constitutional law. *See Eddings,* 455 U.S. at 110 ("[T]he Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978))).

But the comments do not stand alone. The jury received constitutionally sound jury instructions—including one specifically identifying the categories of evidence offered in mitigation—and Mr. Simpson offered extensive evidence on each of those

52

topics. *See* Section I.B.1.a.ii, *supra*. Under these circumstances, we cannot say that no fairminded jurist would agree with the OCCA's conclusion that the jury was not precluded from considering the evidence offered by Mr. Simpson in mitigation. *See Richter*, 562 U.S. at 102. It follows then, that under AEDPA, the OCCA's decision was not unreasonable.[28]

### D.  *Prosecutorial Misconduct*

Mr. Simpson claims that, during the closing arguments in his sentencing trial, the prosecutor made improper comments that rendered his trial so fundamentally unfair it deprived him of his due process rights. The OCCA denied this claim on direct appeal, holding that any improper comments did not render Mr. Simpson's sentencing trial fundamentally unfair when considered within the context of the entire trial. *Simpson I*, 230 P.3d at 899.

---

[28] The prosecution's misuse of the instruction here occurred despite defense counsel's motion for an order in limine prohibiting precisely this type of argument. Furthermore, at the time of the prosecutor's argument, both this court and the OCCA had previously held that such comments are improper and risk erroneously informing the jury that it cannot consider legally relevant mitigating evidence. *See Le v. Mullin*, 311 F.3d 1002, 1017–18 (10th Cir. 2002); *Harris v. State*, 164 P.3d 1103, 1113–14 (Okla. Crim. App. 2007). We find ourselves yet again chastising prosecutors for engaging in the kind of inappropriate behavior that undermines our constitutional protections and "create[s] grave risk of upsetting an otherwise unobjectionable verdict on appeal or on collateral review. It is time to stop." *See Bland v. Sirmons*, 459 F.3d 999, 1028 (10th Cir. 2006). We remind prosecutors they are representatives of the government and "servant[s] of the law." *See Berger v. United States*, 295 U.S. 78, 88 (1935). Their obligation is not to "win a case, but [to see] that justice shall be done." *Id.* "It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one," *id.*, and there is no place in the law for those who would do otherwise.

We begin our review of this claim by first setting forth the OCCA's decision. We next consider the proper standard of review, rejecting Mr. Simpson's claim that the OCCA's decision is so unclear as to be unentitled to AEDPA deference. Having concluded the claim is subject to AEDPA deference, we then provide a discussion of the general legal background governing claims of prosecutorial misconduct affecting the fundamental fairness of a proceeding. Ultimately, we conclude the OCCA's decision is not unreasonable under AEDPA's deferential standard, and we deny relief on this claim.

## 1. OCCA Decision

Mr. Simpson raised his prosecutorial misconduct claim on direct appeal. Reviewing for plain error, the OCCA denied relief, stating:

> The alleged instances of [prosecutorial] misconduct include allegations that the prosecutor argued facts not in evidence, engaged in unnecessary ridicule of [Mr. Simpson], contrasted [Mr. Simpson's] situation with that of the victims', appealed to justice and sympathy for the victims and their families and improperly shifted the burden of proof. Many of these comments, including the single comment met with objection, fell within the broad parameters of effective advocacy and do not constitute error. We review those comments bordering upon impropriety within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel. Given the magnitude of the State's evidence against [Mr. Simpson,] this Court finds that any inappropriate comments not objected to did not deprive [Mr. Simpson] of a fair trial or affect the jury's finding of guilt or assessment of punishment. There was no plain error here.

*Id.* (citations omitted).

54

## 2. Standard of Review

Mr. Simpson claims this court should review his prosecutorial misconduct claims de novo for two reasons. First, he argues the OCCA did not adjudicate his federal claim on the merits. Second, Mr. Simpson contends that, even if the OCCA intended to resolve some of his prosecutorial misconduct claims on the merits, its decision is not entitled to AEDPA deference because it is unclear which claims the OCCA adjudicated on the merits and which it did not. We address each argument in turn.

### a. *Adjudication on the merits*

"[W]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (quoting *Richter*, 562 U.S. at 92). Even when a state court "fails either to mention the federal basis for the claim or cite any state or federal law in support of its conclusion," we presume the court "reache[d] a decision on the merits." *Fairchild I*, 784 F.3d at 712 (internal quotation marks omitted); *see Johnson*, 568 U.S. at 301 (reiterating that a rebuttable presumption applies even "[w]hen a state court rejects a federal claim without expressly addressing that claim"). This presumption "may be overcome when there is reason to think some other explanation for the state court's decision is more likely," *Richter*, 562 U.S. at 99–100, or when the claim was rejected due to "sheer inadvertence," *Johnson*, 568 U.S. at 303. The petitioner bears the burden of showing a claim was not adjudicated on the merits in state court. *Fairchild*

*I*, 784 F.3d at 711. Thus, the OCCA's decision is entitled to deference unless Mr.

Simpson can show some reason to believe it is more likely the OCCA adjudicated his

claim solely under state law principles. *See Richter*, 562 U.S. at 99–100.

Mr. Simpson attempts to make this showing by pointing to the OCCA's statement

that it "will not grant relief based on prosecutorial misconduct unless the State's

argument is so flagrant and that it so infected the defendant's trial that it was rendered

fundamentally unfair." *Simpson I*, 230 P.3d at 899. He contends this standard creates a

different analytical standard than the federal rule. According to Mr. Simpson, the use of

the word "flagrant" implies an additional requirement that is not present in federal

review. This argument is without merit. Not only is there no additional definition or

analysis conducted by Oklahoma courts to satisfy this alleged extra element, but we have

already ruled that Oklahoma's standard is the same as the federal standard. *E.g.*, *Bland*,

459 F.3d at 1024; *Patton v. Mullin*, 425 F.3d 788, 811 (10th Cir. 2005).

For these reasons, we review Mr. Simpson's claim under AEDPA, and he is

entitled to relief only if the OCCA's decision was an unreasonable application of clearly

established federal law.[29]

---

[29] Mr. Simpson raises two additional, alternative bases for de novo review of this claim. First, Mr. Simpson argues de novo review is required because the OCCA "said nothing about the misconduct's impingement on [his] constitutional rights to present mitigation." *See* Aplt. Br. at 92. We disagree. As discussed *supra*, the OCCA considered Mr. Simpson's claim that the improper statements unconstitutionally limited his presentation of mitigating evidence in conjunction with his challenge to the language of the instruction. *Simpson I*, 230 P.3d at 904 ("A review *of the prosecutor's closing argument concerning the mitigating evidence instruction*, the mitigating evidence itself and all instructions concerning mitigating evidence given in this case supports our

b. *Scope of decision on the merits*

The OCCA noted that it had reviewed the alleged misconduct and found that "[m]any of these comments . . . fell within the broad parameters of effective advocacy and do not constitute error." *Id.* But the court then stated it had reviewed "those comments bordering upon impropriety" for plain error and concluded that Mr. Simpson was not deprived of a fair trial. *Id.* Of significance for our purposes, the OCCA never specified which statements it considered appropriate advocacy and which it deemed "bordering upon impropriety." *Id.* As a result, Mr. Simpson contends the OCCA's decision is not entitled to AEDPA deference. We are not convinced.

In *Douglas*, 560 F.3d at 1178–79, we considered a similar issue. There, the state court's plain error opinion stated only that it had reviewed the defendant's multiple prosecutorial misconduct claims and found no plain error. As in this case, it was impossible in *Douglas* "to determine whether the court's review was or was not merits

_____

conclusion that the jurors' consideration of the evidence offered in mitigation was not unfairly limited in this case." (emphasis added)). The improper prosecutorial argument claim we address in this section—although including the Moral Culpability Comments— is not tied to Mr. Simpson's claim that the jury was precluded from considering his mitigation evidence, and the OCCA accordingly analyzed the claims separately. We have adopted the same approach here.

Second, Mr. Simpson argues the OCCA's analysis is "'contrary to' clearly established federal law because it did not examine the entire proceedings, including the strength of the evidence against Mr. Simpson as to the critical sentencing phase." Aplt. Br. at 93 n.51. But a review of the OCCA's opinion refutes this assertion. *Simpson I*, 230 P.3d at 899 ("We review those comments bordering upon impropriety *within the context of the entire trial*, considering not only the propriety of the prosecutor's actions, but *also the strength of the evidence against the defendant and the corresponding arguments of defense counsel*." (emphasis added)).

57

based" on a statement-by-statement review. *See id.* at 1178. We held that in such situations, "our cases require us to assume that the state's review is on the merits and thus afford it § 2254(d) deference." *Id.* Accordingly, we review Mr. Simpson's "assertion of improper prosecutorial comments independently under federal law, and . . . afford § 2254(d) deference to the OCCA's ultimate conclusion that a new [sentencing] trial was not warranted on the basis of prosecutorial misconduct." *See id.* at 1178–79.

### 3. Legal Background

A prosecutor's misconduct will warrant a new trial only where the improper statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 645 (1974)). An assessment of the fundamental fairness of Mr. Simpson's sentencing trial "requires [an] examination of the entire proceedings, including the strength of the evidence against the petitioner" at both the guilt and sentencing stages of trial. *See id.* We also consider "[a]ny cautionary steps—such as instructions to the jury—offered . . . to counteract improper remarks" and "[c]ounsel's failure to object to the comments." *Id.* "Ultimately, this court considers the jury's ability to judge the evidence fairly in light of the prosecutor's conduct." *Id.*

Given the nature of prosecutorial misconduct claims, we evaluate the prejudicial impact of any improper comments individually and collectively. *See id.* at 1022 ("Our cases on prosecutorial misconduct make it clear that we must consider all the complained of conduct *in toto* because individual, harmless prosecutorial errors can add up to make a

58

trial fundamentally unfair in the aggregate."). "In death-penalty cases, we review whether the improper comments as a whole so infected the trial with unfairness as to . . . render[] the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case." *Bland*, 459 F.3d at 1029 (internal quotation marks omitted).

## 4. Merits

Mr. Simpson claims the prosecutor made improper comments during closing argument that fall into four broad categories: (1) Moral Culpability Comments; (2) denigration of mitigation evidence; (3) improper comparison between the victims and the defendant; and (4) improper calls for the death penalty as a civic responsibility. Mr. Simpson did not raise contemporaneous objections to these comments. As a result, the OCCA reviewed for plain error. *Simpson I*, 230 P.3d at 899. We begin our review by individually evaluating each category of the prosecutor's argument challenged by Mr. Simpson to determine whether any resultant misconduct rendered his trial fundamentally unfair. Then, we evaluate the collective prejudice of all misconduct. We do so under the deferential AEDPA standard because the OCCA rendered a decision on the merits of this claim.

### a. *Moral Culpability Comments*

Having already identified the Moral Culpability Comments challenged by Mr. Simpson, we turn to the propriety of such comments and whether any of them, individually or cumulatively, denied Mr. Simpson a fundamentally fair sentencing trial.

Here, we are guided by our decision in *Le*. In *Le*, the prosecution made the following statements during closing arguments regarding the defendant's mitigating evidence:

> We have a whole list of things that have been submitted as mitigating circumstances. *The Court instructs you that mitigating circumstances are those which in fairness and mercy—get this—may be considered as extenuating or reducing the moral culpability or blame. It doesn't say anything about whether you've been a good guy in the past or anything like that.* Do these circumstances extenuate or reduce the degree of moral culpability o[r] responsibility for what he did? It's up to you to decide what are mitigating circumstances.
>
> The defense talks about Mr. Le being a hard worker, a machinist, invent[or], a good teacher, teaching English to Vietnamese people, good to family. Does that in any way officiate (sic) or mitigate or relieve or make any less horrible what he did to [the victims]? I submit to you they do not. He's good to his family. He's got five things on here about his family. Well, nearly everybody is good to their family. Does it make it all right to go out and murder? Does it make you less guilty when you go out and commit this kind of a crime?

311 F.3d at 1016–17 (internal quotation marks omitted).

Like in Mr. Simpson's case, the prosecutor construed the instruction as limited to evidence that reduces moral culpability or blame and then specifically argued Mr. Le's evidence did not meet that criteria. In *Le*, we determined the prosecutor's remarks were irrelevant, improper, and "may have implied that the jury had the ability to ignore the legal requirement that it must consider mitigating evidence." *Id.* at 1018. But we also noted the jury received the correct instructions and defense counsel mitigated the impact of the prosecution's misstatement by reminding the jury that it must, by law, consider all mitigating evidence. *Id.* at 1018–19. We concluded that "in light of the overwhelming evidence of Mr. Le's guilt and evidence of the presence of aggravating factors, because

both the jury instructions and the defense counsel's argument correctly stated the law, and because [the prosecutor] never explicitly and clearly misstated the law," the OCCA's determination that Mr. Le's trial was not rendered fundamentally unfair was reasonable. *Id.* at 1019.

Here, we are compelled to reach the same result. The Moral Culpability Comments were improper and pervasive. Nevertheless, the evidence of Mr. Simpson's guilt was overwhelming, the State presented powerful aggravating evidence, and we have already concluded the jury was not precluded from considering Mr. Simpson's mitigating evidence. As we now explain, when we view the misconduct in the context of the entire proceeding, we cannot conclude the OCCA acted unreasonably in holding that the prejudicial impact of these comments, individually or cumulatively, did not render the sentencing trial fundamentally unfair.

b. *Denigration of mitigation evidence*

Mr. Simpson asserts several instances where he claims the prosecutor improperly denigrated his mitigating evidence. Prosecutors are given a "wide latitude of argument," *Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005), and may properly comment "on the weight that should be accorded to the mitigating factors," as well as "information about the defendant, his character, and the circumstances of his offense made known to the jury throughout the bifurcated trial," *Fox*, 200 F.3d at 1300 (internal quotation marks omitted). *See Bland*, 459 F.3d at 1026 ("As long as the jury is properly instructed on the use of mitigating evidence, the prosecution is free to comment on the weight the jury

61

should accord to it."). But it is improper for a prosecutor to make an argument based purely on personal opinion. *See Le*, 311 F.3d at 1017–18. Keeping these principles in mind, we evaluate whether any of the statements challenged by Mr. Simpson, either individually or collectively, render his sentencing trial fundamentally unfair.

Mr. Simpson challenges five statements[30] in which he alleges the prosecutor shamed him for relying on his family support[31] and his mental condition[32] as mitigating factors. For example, the prosecutor called Mr. Simpson's PTSD diagnosis an "excuse"[33]

---

[30] In addition to the comments identified below, Mr. Simpson claims several of the prosecutor's comments about the defense giving the jury a "guilt trip" denied him a fair trial. He did not challenge these statements in the OCCA or the district court, and we will not consider them in the first instance. *See Parker v. Scott*, 394 F.3d 1302, 1307 (10th Cir. 2005).

[31] "They fed him, they clothed him, they provided love. They hugged him, they sent him to school. Those are nice people. Shame on him for hiding behind his family. They don't want to be here. . . . Shame on him for hiding behind his family support. Those are good people.
    . . . How in the world does hiding behind his family support reduce his degree of moral culpability or blame?" Trial Tr. vol. 8 at 25.

[32] "Now [Mr. Simpson's voluntary intoxication defense] didn't work. So now we're coming in yesterday and, okay, you don't buy that, now we go to door number two, we've got Post-Traumatic Stress Disorder. You know, shame on them. Again, that's ducking responsibility. . . . You know, it's an insult to all legitimate people with PTSD." Trial Tr. vol. 8 at 28.

[33] "Even if somehow you find that, okay, more likely than not he's got Post-Traumatic Stress, that's not an excuse. Judge Gray didn't tell you that's an excuse. . . . It's just something he's trying to hide behind. . . ." Trial Tr. vol. 8 at 29.

and an "insult" [34] to "legitimate people with PTSD."[35] It is appropriate for the prosecutor to argue based on the record facts that Mr. Simpson did not actually suffer from PTSD and was instead using it as an excuse to avoid responsibility. But characterizing Mr. Simpson's diagnosis as an "insult to all legitimate people with PTSD" and "legitimate veterans" strays into inappropriate personal opinion. Similarly, the prosecutor's comments suggesting the defense should be ashamed for relying on Mr. Simpson's family support and mental health improperly denigrated Mr. Simpson's mitigating evidence. *See Cuesta-Rodriguez v. Royal*, No. CIV-11-1142-M, 2016 WL 5485117, at *10, 13 (W.D. Okla. Sept. 29, 2016) (finding that the prosecutor "may have inched close to improper argument" by shaming the defendant for using his family as a mitigating factor).

Although several of these statements were improper, none of them, separately or cumulatively, rises to the level necessary to have deprived Mr. Simpson of a fundamentally fair sentencing proceeding. Similar improper prosecutorial statements have rarely been held, standing alone, to render a trial fundamentally unfair. This is especially so in a case, such as this one, where the State has presented significant evidence in aggravation. *See generally Le*, 311 F.3d at 1021.

---

[34] "Some guy [Dr. Massad] comes in here and tells you, well, more likely than not he's got Post-Traumatic Stress Disorder. You know what? That is an insult to people that really do." Trial Tr. vol. 8 at 26.

[35] "When I say shame on them, lots of people have Post-Traumatic Stress Disorder, that is an insult to legitimate veterans." Trial Tr. vol. 8 at 27.

c. *Improper comparison with the victims*

Mr. Simpson next objects to the prosecutor's statement: "Of course, [Mr. Simpson's family would] go to the penitentiary to see him. Of course they would. You know, they're good people. These victims can't. They can go to the cemetery." Trial Tr. vol. 8 at 25. We agree that "it is prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison." *Bland*, 459 F.3d at 1028. The statement here was an improper comment designed to stir the jurors' emotions and elicit sympathy for the victims. *See id.* at 1027 (holding improper the prosecutor's statement "[m]aybe the Defendant will be in prison . . . [b]ut one thing is for sure, [the victim] won't be here and his family won't be able to be with him"). Nonetheless, considering the extensive aggravating evidence presented to the jury, we cannot conclude that this single reference to the plight of the victims, as compared to Mr. Simpson, rendered the sentencing trial fundamentally unfair.

d. *Justice demands a death sentence*

We have also held that "it is improper for a prosecutor to suggest that a jury has a civic duty to convict." *Bland*, 459 F.3d at 1027 (internal quotation marks omitted). Although an appeal to justice and civic duty is not always improper, *see Hanson*, 797 F.3d at 839 (finding it proper to tell the jury it will be doing justice by deciding *which* punishment is appropriate rather than asserting *death* is appropriate), urging the jury to "impose a death sentence on the grounds of civic duty" is inappropriate, *Le*, 311 F.3d at 1022 (finding it improper to tell the jury they "could only do justice in this case by

64

bringing in a verdict of death" (internal quotation marks omitted)). Here, the prosecutor's comments mirror the language in *Le* and cross the bounds of permissible argument:

> Justice in this case demands you to do the most difficult thing you have to do in *fulfilling your civic duty as a juror. Justice for Glen Palmer, for his family, justice for Anthony Jones and his family, demands that you render a verdict of the death penalty in this case. Justice demands it.* And it will be difficult but, ladies and gentlemen, I'm going to ask you to let your verdict speak to this Defendant. Let your verdict speak to Glen Palmer's family. Let your verdict speak to Anthony Jones'[s] family.

> Let your verdict speak to the carnage that this Defendant has left behind and his commitment to be a criminal and a cold-blooded killer. And let your verdict speak for the community that in this kind of a case for this Defendant *there is one just verdict and only one and that is to recommend a sentence of death.*

Trial Tr. vol. 8 at 63–64 (emphasis added).

Despite the impropriety of the prosecutor's argument, we are not convinced this comment, on its own, deprived Mr. Simpson of a fundamentally fair sentencing proceeding in view of the "overwhelming evidence of Mr. [Simpson's] guilt, evidence of aggravating factors supporting the death sentence, [and] the general content of the instructions to the jury." *See Le*, 311 F.3d at 1022.

e. *Totality of prosecutorial misconduct*

Although we have identified a substantial number of improper prosecutorial statements, none of them, standing alone, was sufficiently prejudicial to deny Mr. Simpson his due process rights. "[B]ecause individual, harmless prosecutorial errors can add up to make a trial fundamentally unfair in the aggregate," *id.*, we now consider the cumulative effect of the improper statements.

Given the extensive and recurring misconduct committed by the prosecutor, it is appropriate to question whether the jury was able to judge the evidence fairly. But the OCCA answered that question affirmatively and, under AEDPA, we are bound by the OCCA's "ruling unless it constitutes an unreasonable application of the cumulative-error doctrine." *See Thornburg*, 422 F.3d at 1137. The petitioner's burden under this standard is steep, and we cannot say that no reasonable jurist would agree with the OCCA that the prosecutor's misconduct did not prevent the jury from fairly considering the evidence during the sentencing phase of trial. The evidence of Mr. Simpson's guilt was overwhelming, the State presented significant evidence in support of the aggravating factors, and the jury was properly instructed as to its ability to consider mitigating evidence and to impose a sentence less than death. Therefore, the OCCA's determination that the prosecutor's misconduct did not deny Mr. Simpson a fundamentally fair sentencing trial is reasonable and must be upheld under AEDPA.

### E.      *Especially Heinous, Atrocious, or Cruel Aggravator*

Mr. Simpson next claims there is insufficient evidence to support the jury's finding that the murder of Glen Palmer was heinous, atrocious, or cruel and that the HAC Aggravator is unconstitutionally overbroad. In addressing this claim, we begin by discussing the general legal background governing challenges to capital aggravators. Next, we provide additional factual and procedural background, including the resolution of Mr. Simpson's claim in the state court proceedings and in the district court. Although Mr. Simpson raised both a sufficiency-of-the-evidence claim under the Fourteenth

Amendment and a vagueness claim under the Eighth Amendment in the state court,[36] we determine that he abandoned his Eighth Amendment argument in the district court. We therefore consider only his Fourteenth Amendment sufficiency-of-the-evidence claim in this opinion. In doing so, we first provide a discussion of the relevant law and then conclude the OCCA's decision holding that the evidence is sufficient to support the HAC aggravator as to Mr. Palmer is not unreasonable. As a result, we deny relief on this claim.

1. **Legal Background**

As we recently explained in *Wood v. Carpenter*, a defendant can challenge the jury's finding of a capital aggravator in two ways:

> First, a defendant can bring a sufficiency of the evidence claim under *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). It violates the Fourteenth Amendment's guarantee of due process if a jury sentences a defendant to death based on an aggravator, even though there was insufficient evidence for any rational juror to have concluded the aggravator was met. Because state law defines aggravators, this question turns on state law.
>
> Second, petitioners can challenge an aggravating circumstance as unconstitutionally vague. It violates the Eighth and Fourteenth Amendments for death sentences to be arbitrarily imposed. As a consequence, if an aggravating circumstance is so vague it could apply to any and every murder, then sentencing a defendant to death because that aggravator was met violates the Constitution.

907 F.3d 1279, 1305 (10th Cir. 2018) (citations omitted).

---

[36] As we discuss below, a vagueness claim also invokes protections afforded by the Fourteenth Amendment. For ease of reference, however, we refer to Mr. Simpson's challenge to the sufficiency of the evidence as his Fourteenth Amendment claim and his vagueness challenge as his Eighth Amendment claim.

67

The distinction between these two methods of challenging a capital aggravator is important here because although Mr. Simpson initially pursued both avenues, he later abandoned his Eighth Amendment claim. We now discuss the evolution of Mr. Simpson's claims regarding the HAC Aggravator.

## 2. Factual and Procedural Background

### a. *Trial*

During the sentencing stage of Mr. Simpson's trial, the jury was instructed that, to impose the HAC Aggravator, it must find the State had proven beyond a reasonable doubt that the murder of Mr. Palmer "was preceded by either torture of the victim or serious physical abuse of the victim." Trial R. vol. 3 at 600. The trial court further instructed that torture is defined as "the infliction of either great physical anguish or extreme mental cruelty." *Id.* The instruction also stated the jury could not find "serious physical abuse" or "great physical anguish" unless "the victim experienced conscious physical suffering prior to his death." *Id.*

In his closing statement, the prosecutor told the jury the State "must prove . . . that the murder in this case of Glen Palmer was either preceded by torture or serious physical abuse." Trial Tr. vol. 8 at 10. The prosecutor then conceded, "[t]here's no question it's not torture," but he asserted that it did constitute "serious physical abuse." *Id.* The jury found the HAC Aggravator both as to the murder of Mr. Palmer and, although it was never argued, as to the murder of Mr. Jones.

68

b. *OCCA and district court decisions*

On direct appeal, Mr. Simpson claimed there was insufficient evidence to support the HAC Aggravator under the Fourteenth Amendment and that to apply it to the facts of this case would broaden the aggravator beyond the constitutional limits proscribed by the Supreme Court and the Eighth Amendment. The OCCA did not address Mr. Simpson's Eighth Amendment claim, but held there was sufficient evidence to support the HAC Aggravator for Mr. Palmer:

> With regard to the murder of Glen Palmer, the evidence showed that Palmer was shot four times. He suffered a grazing gunshot wound to the right shoulder, two superficial gunshot wounds to the left side of his back, and an ultimately fatal gunshot wound to his chest. Although he was initially conscious after being shot, his breathing became labored and he made gurgling sounds as his chest filled with blood before he died. There was testimony that immediately after he had been shot, Palmer was able to speak, was aware that he had been shot and was fearful that the shooters would return. Reviewing the evidence in the light most favorable to the State, we find that the evidence supports a finding that Palmer's death was preceded by physical suffering and mental cruelty.

*Simpson I*, 230 P.3d at 902–03. The OCCA reached a contrary conclusion as to Mr. Jones because "he likely died within seconds of being shot." *Id.* at 903. It therefore struck the aggravator as to the murder of Mr. Jones, but determined that no relief was necessary because the State had not presented any evidence solely in support of the HAC Aggravator as to Mr. Jones, and thus "the jury's weighing process of mitigating evidence against aggravating circumstances was not skewed." *Id.* Mr. Simpson did not take any action to obtain a ruling from the OCCA on his Eighth Amendment claim. *See, e.g.*, Rule of the Court of Criminal Appeals 3.14(B)(1) (permitting petition for rehearing if "[s]ome

question decisive of the case and duly submitted by the attorney of record has been overlooked by the court").

In the district court, Mr. Simpson renewed his claim that there was insufficient evidence to support the HAC Aggravator as to Mr. Palmer, but he did not argue the HAC Aggravator was unconstitutionally vague, either on its face or as applied to him. The district court held the OCCA's decision was not unreasonable "in light of the double deference afforded it" when reviewing sufficiency of the evidence claims under AEDPA. *Simpson IV*, 2016 WL 3029966, at *25. Mr. Simpson challenges that decision in his appeal to this court.

## 3. Preservation

The State argues we should review only Mr. Simpson's Fourteenth Amendment sufficiency-of-the-evidence challenge because Mr. Simpson did not preserve the Eighth Amendment vagueness claim by failing to raise it in the district court and by inadequately briefing it in his opening brief to this court. Mr. Simpson asserts that he has "always argued the Fourteenth Amendment insufficiency-of-the-evidence claim cannot be assessed in a vacuum, and that [the] OCCA must assess the evidence under a constitutionally narrow standard." Aplt. Reply Br. at 33. In support, he points to a single footnote in his opening brief to the district court which merely requested supplemental briefing on the HAC Aggravator because the page constraints on his brief did "not permit a complete analysis of . . . the unreasonable failure of the OCCA to abide by the limiting requirements of the Supreme Court in *Maynard v. Cartwright*, 486 U.S. 356 (1988)[,] and

70

the Tenth Circuit in *Thomas v. Gibson*, 218 F.3d 1213, 1227 (10th Cir. 2000)." App'x at 122. But Mr. Simpson provided no analysis of those decisions.

By not raising an Eighth Amendment challenge to the HAC Aggravator in the district court and inadequately briefing it here, Mr. Simpson has failed to preserve that claim.[37] *See Stouffer v. Trammell*, 738 F.3d 1205, 1222 n.13 (10th Cir. 2013) ("We do not generally consider issues that were not raised before the district court as part of the habeas petition."); *Heard v. Addison*, 728 F.3d 1170, 1175 (10th Cir. 2013) ("We do not reach that issue in this case, however, because . . . we conclude that [Mr.] Heard never raised such a claim, in his petition or otherwise, before the federal district court."). As a result, we consider only whether the OCCA's sufficiency-of-the-evidence decision was unreasonable. Because the OCCA decided that issue on the merits, we afford it deference under AEDPA. *See* 28 U.S.C. § 2254(d).

---

[37] Mr. Simpson argues that his Eighth Amendment claim is preserved under this court's decision in *Pavatt v. Royal,* 859 F.3d 920 (10th Cir.), *opinion amended and superseded on denial of reh'g*, 894 F.3d 1115 (10th Cir. 2017), *reh'g en banc granted sub nom Pavatt v. Carpenter*, 904 F.3d 1195 (10th Cir. 2018). We disagree. The *Pavatt* decision on which Mr. Simpson relies has been amended and superseded. The presently-controlling version of *Pavatt* clearly indicates that Mr. Pavatt raised both a Fourteenth Amendment sufficiency-of the-evidence claim and an Eighth Amendment vagueness challenge to the HAC Aggravator as defined by state law. 894 F.3d at 1125. Mr. Simpson challenged only the sufficiency of the evidence in his habeas petition and he has therefore not preserved any Eighth Amendment claim.

### 4. Sufficiency of the Evidence

   a. *Additional legal background*

We review the sufficiency of the evidence "under the 'rational fact-finder' standard announced in *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)," which requires an appellate court to "determine, after reviewing the evidence presented at trial in the light most favorable to the government, whether any rational trier of fact could have found the aggravating circumstance existed beyond a reasonable doubt." *Boltz v. Mullin*, 415 F.3d 1215, 1232 (10th Cir. 2005). "To assess the sufficiency of the evidence, we first determine the elements of the offense and then examine whether the evidence suffices to establish each element." *Anderson-Bey v. Zavaras*, 641 F.3d 445, 448 (10th Cir. 2011). When reviewing the sufficiency of the evidence in capital cases, "aggravating factors operate as 'the functional equivalent of an element of a greater offense.'" *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)). The substantive elements of an aggravating factor necessary to impose the death penalty are a matter of state substantive law. *Hamilton v. Mullin*, 436 F.3d 1181, 1194 (10th Cir. 2006).

Under Oklahoma law, to establish the HAC Aggravator, the State must prove beyond a reasonable doubt "that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty." *Warner v. State*, 144 P.3d 838, 880 (Okla. Crim. App. 2006), *overruled on other grounds by Taylor v. State*, 419 P.3d 265 (Okla. Crim. App. 2018).

"Serious physical abuse requires evidence of conscious physical suffering." *Id.* While the extent of the mental anguish or physical abuse a victim suffers "is not susceptible to mathematical precision," *Walton v. Arizona*, 497 U.S. 639, 655 (1990), *overruled on other grounds by Ring*, 536 U.S. at 588–89, it must be more than "the brief duration necessarily accompanying virtually all murders," *Medlock v. Ward*, 200 F.3d 1314, 1324 (2000) (Lucero, J., concurring).

   b.  *Merits*

As discussed, because the OCCA decided Mr. Simpson's sufficiency-of-the-evidence claim on direct appeal, AEDPA constrains our review. Review of sufficiency of the evidence under AEDPA "adds an additional degree of deference, and the question becomes whether the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard." *Hooks II*, 689 F.3d at 1166 (internal quotation marks omitted). Mr. Simpson asserts the OCCA's decision was unreasonable because it "did not assess the level of [Mr. Palmer's] suffering, but rather assumed . . . that because [Mr.] Palmer died more slowly than [Mr.] Jones he was in 'great physical anguish.'" Aplt. Br. at 97. The State counters that the question is not the length or extent of Mr. Palmer's suffering; the question is whether there was sufficient evidence to support the jury's conclusion that Mr. Palmer experienced conscious physical suffering as Oklahoma defines it. Reviewing the evidence in the light most favorable to the government, the State contends the OCCA was reasonable in concluding such evidence exists. We agree.

73

Here, the State relied on the testimony of Dr. Jeffrey Grofton, the coroner who performed Mr. Palmer's autopsy, and London Johnson, the surviving victim, to establish that Mr. Palmer experienced conscious physical suffering. Mr. Palmer was shot four times, but was conscious long enough to perceive that he had been shot and to fear further injury. Mr. Johnson, who was in the car with Mr. Palmer and Mr. Jones when it was suddenly fired upon, testified that when he opened the car door, Mr. Palmer told him to "[s]hut that door. They're going to come back." Trial Tr. vol. 3 at 42. Mr. Palmer then revealed he had been shot and was unable to move. Mr. Johnson also testified that Mr. Palmer's breathing "sounded like he was – like he was trying to breathe, but he had blood in his throat." Trial Tr. vol. 3 at 45. Dr. Grofton testified that Mr. Palmer possibly experienced difficulty breathing because "the left side of [his] chest was filling up with blood which would essentially collapse the left lung making it exceedingly difficult to breathe." Trial Tr. vol. 5 at 162–63. Mr. Palmer died before emergency assistance arrived.

Although Mr. Palmer did not expressly state he was in pain, and neither Dr. Grofton nor Mr. Johnson testified as to how long Mr. Palmer was conscious or whether he appeared to be in pain, the jury could have reasonably inferred that Mr. Palmer experienced conscious physical suffering based on the evidence about his wounds. Mr. Palmer was conscious and able to speak for some period of time before he died. He was aware of his injuries and struggled to breathe as his lungs filled with blood. Viewing the evidence in the light most favorable to the State and applying AEDPA's deferential

74

standard of review, we cannot conclude the OCCA acted unreasonably in deciding there was sufficient evidence to support the jury's finding that Mr. Palmer experienced conscious physical suffering as defined by Oklahoma law. We therefore deny Mr. Simpson relief on this claim.

### F.        *Ineffective Assistance of Counsel*

Mr. Simpson alleges his trial counsel was ineffective during both the guilt and sentencing stages of the trial. With respect to the guilt stage, Mr. Simpson contends trial counsel was ineffective for failing to request a second-degree murder instruction. As to the sentencing stage of trial, Mr. Simpson argues trial counsel preformed ineffectively by failing to: (1) investigate, prepare, and present lay witnesses, (2) object to improper prosecutorial arguments, (3) object to the mitigating evidence jury instruction, and (4) object to the HAC jury instruction.

In reviewing this claim, we begin with a general discussion of the relevant legal background. We then consider each allegation of ineffective performance individually. In doing so, we provide any further discussion of law pertinent to the particular allegation of ineffectiveness. We then review the OCCA's decision to determine whether it rejected that claim on the merits. Finally, we address whether the OCCA's merits decision was reasonable. In each instance, we conclude the OCCA's merits decision was not contrary to or an unreasonable application of Supreme Court law and was not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). We therefore deny relief on Mr. Simpson's IAC claim.

75

## 1. Legal Background

Claims of ineffective assistance of counsel are evaluated under the two-prong approach established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). To establish an ineffective assistance of counsel claim, Mr. Simpson "must show both that his counsel's performance 'fell below an objective standard of reasonableness' *and* that 'the deficient performance prejudiced the defense.'" *See Byrd v. Workman*, 645 F.3d 1159, 1167 (10th Cir. 2011) (quoting *Strickland*, 466 U.S. at 687–88). When evaluating whether counsel's performance was deficient, "[t]he question is whether [the] representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). Judicial review under this standard is "highly deferential," *Strickland*, 466 U.S. at 689, and "we strongly presume that an attorney acted in an objectively reasonable manner and that an attorney's challenged conduct *might* have been part of a sound trial strategy," *Hanson*, 797 F.3d at 826 (internal quotation marks omitted). Furthermore, "[w]e must 'judge the reasonableness of counsel's challenged conduct' on the specific facts of the case 'viewed as of the time of counsel's conduct.'" *Id.* at 826 (quoting *Strickland,* 466 U.S. at 690).

Even if counsel performed in a constitutionally deficient manner, Mr. Simpson is not entitled to relief unless he can prove actual prejudice. *See Strickland*, 466 U.S. at 687–88. To demonstrate prejudice, Mr. Simpson must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *See id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Review under both AEDPA and *Strickland* is "highly deferential, and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## 2. Failure to Investigate, Prepare, and Present Lay Witnesses

### a. *Additional legal background*

Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. "When a petitioner alleges ineffective assistance of counsel stemming from a failure to investigate mitigating evidence at a capital-sentencing proceeding, we evaluate the totality of the evidence—both that adduced at trial, and the evidence adduced in habeas proceedings." *Williams v. Trammell*, 782 F.3d 1184, 1215 (10th Cir. 2015) (internal quotation marks omitted). In doing so, we "reweigh the evidence in aggravation against the totality of available mitigating evidence," *Hooks II*, 689 F.3d at 1202 (internal quotation marks omitted), considering "the strength of the State's case and the number of aggravating factors the jury found to exist, as well as the mitigating evidence the defense did offer and any additional mitigating evidence it could have offered," *Knighton v. Mullin*, 293 F.3d 1165, 1178 (10th Cir. 2002). And, when conducting our reweighing

77

analysis, we "must consider not just the mitigation evidence that [Mr. Simpson] claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been." *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013). Prejudice is established if a defendant can show "a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Bland*, 459 F.3d at 1030 (quoting *Strickland*, 466 U.S. at 695).

b. *OCCA decision*

Mr. Simpson argued that trial counsel rendered constitutionally ineffective assistance relative to the investigation and presentation of mitigating evidence at the sentencing stage. On direct appeal, the OCCA stated:

> Next, [Mr. Simpson] complains that defense counsel was ineffective for failing to adequately investigate and present additional evidence of innocence. He first specifically complains that counsel was ineffective for failing to investigate and present additional mitigating evidence. While [Mr. Simpson] has shown this Court that additional mitigation witnesses could have been called and others that were called could have given additional testimony, he has not shown a reasonable probability that but for counsel's alleged unprofessional error in not presenting this evidence, the result of the proceeding would have been different.

*Simpson I,* 230 P.3d at 904–05. Thus, the OCCA assumed deficient performance but concluded Mr. Simpson failed to satisfy the prejudice prong of *Strickland*. We take a

similar path in resolving this claim, assuming deficient performance and giving AEDPA deference to the OCCA's determination on the prejudice prong.

c. *Merits*

Mr. Simpson faults his trial counsel for not presenting a more comprehensive picture of his troubled upbringing. On direct appeal, evidence surfaced that Mr. Simpson's mother became addicted to crack cocaine when he was a young child and that drug use and violence were common in the home. In the midst of this instability, Mr. Simpson became sexually active at fourteen and had fathered children with two separate women by the time he was sixteen years old. He also began skipping school, using and selling drugs, committing burglaries, and carrying guns as early as age fourteen. The evidence on direct appeal further indicated that Mr. Simpson reported being sexually assaulted as a teenager. Mr. Simpson faults his trial counsel for failing to develop the story of his traumatic childhood.

To properly analyze Mr. Simpson's claim, we first look at the evidence presented in mitigation during sentencing. Recall that the defense relied heavily on Dr. Massad's testimony and the testimony of Mr. Simpson's family about the paranoia Mr. Simpson exhibited after he was shot. From this evidence, the jury was informed of the violence surrounding Mr. Simpson during his teenage years; for what evidence could be more indicative of a violence-filled upbringing than Mr. Simpson being comatose for two months as a result of sustaining five gunshot wounds in a drive-by shooting. And the shooting of Mr. Simpson occurred in retaliation for him deciding not to kill a witness

79

slated to testify against one of his friends—a friend who had been involved in a violent crime. Thus, one of the thrusts of the evidence Mr. Simpson proffers in support of this ineffective assistance of counsel claim was, to some degree, already before the jury such that its theoretical mitigating value is minimized. *Cf. Grant*, 886 F.3d at 924 (upholding OCCA's conclusion of no prejudice for sentencing phase ineffective assistance, by reasoning, *inter alia*, that "omitted evidence of organic brain damage . . . would have merely supplemented" other mitigation evidence already before the jury); *Williams*, 782 F.3d at 1216 (finding lack of prejudice where additional evidence was cumulative of evidence already before the jury).

The mitigating value of the unpresented evidence is further decreased when considered in light of the prosecution's potential response. If the State had an opportunity to respond to Mr. Simpson's additional mitigating evidence, it is not apparent the jury would have viewed the evidence about Mr. Simpson's upbringing, on the whole, as mitigating. Rather, a reasonable jurist could conclude the evidence would have actually increased the odds of a verdict of death as, by Mr. Simpson's own admission, he, before turning sixteen, had already (1) dropped out of school; (2) impregnated two different women; (3) sold drugs; (4) committed burglaries; and (5) routinely carried a firearm. New and additional evidence from the State on these matters would have reduced any sympathy the jury had for Mr. Simpson because the evidence would not only have painted Mr. Simpson as living a lawless life contrary to the norms and expectations of

society, but also would have furthered the State's argument relative to the continuing threat aggravator.

Apart from the potential response by the state to the additional mitigating evidence, we cannot conclude the OCCA reached an unreasonable conclusion on the prejudice prong of *Strickland* when all the mitigating evidence is considered in light of the aggravating evidence. The state presented strong evidence in support of the death sentence, and the additional mitigation does little, if anything, to undermine the aggravating factors found by the jury. A key aspect of Mr. Simpson's offense and a key aspect of his history and characteristics highlight the reasonableness of the OCCA's conclusion. First, in committing his offense, Mr. Simpson sprayed fifteen to twenty bullets at the moving car driven by Mr. Palmer while the vehicle was passing through a residential area. Thus, not only did Mr. Simpson's conduct result in the deaths and serious wounding of the three individuals in the vehicle, it also endangered the lives of other uninvolved persons. Second, and of significant persuasive value, the State presented compelling testimony from Mr. Pham, whom Mr. Simpson had shot in the back of the head, execution-style, after forcing his way into Mr. Pham's house and stealing Mr. Pham's wallet.

In light of the strong evidence offered by the State, as well as the State's likely response to the additional mitigation evidence Mr. Simpson's trial counsel did not present, we conclude Mr. Simpson has not demonstrated the OCCA unreasonably applied

81

*Strickland* and its progeny when it concluded Mr. Simpson was not prejudiced by any alleged deficient performance by counsel. We therefore deny relief on this claim.[38]

### 3. Failure to Preserve the Record

Mr. Simpson next raises ineffective assistance of counsel claims based on several instances where trial counsel allegedly failed to preserve issues for appeal. We address Mr. Simpson's claim that counsel was ineffective for failing to request a second-degree murder instruction, before we turn to the alleged failures we have already rejected as stand-alone claims for habeas relief.

a. *Failure to request a jury instruction on second-degree murder*

Mr. Simpson first asserts that trial counsel was constitutionally ineffective for failing to request an instruction on second-degree depraved mind murder. For the reasons we now explain, we deny relief on this claim.

i. Additional legal background

For counsel's failure to request a lesser-included offense instruction to constitute deficient performance, Mr. Simpson must have been entitled to such an instruction based

---

[38] Mr. Simpson also appeals the district court's denial of his motion for an evidentiary hearing on this claim, which we review for an abuse of discretion. *Fairchild II*, 579 F.3d at 1147. Mr. Simpson cannot satisfy § 2254(e)(2) or the *pre*-AEDPA requirements where § 2254(e)(2) does not apply. *See supra* Section III.B.4. As discussed above, even accepting Mr. Simpson's factual allegations, he cannot show that counsel's mitigation strategy fell below an acceptable level of performance as required to establish constitutional error for purposes of § 2254(e)(2)(B) or an entitlement to relief for purposes of the pre-AEDPA standard where § 2254(e)(2) does not apply because the petitioner tried to diligently develop the factual basis in state court. Therefore, the district court properly denied his request for an evidentiary hearing.

on the evidence presented at trial. *See Bland*, 459 F.3d at 1031 ("Counsel therefore could not have been ineffective in failing to request an instruction to which [the defendant] was not entitled based on the evidence . . . ."). "[T]he availability of a lesser included offense instruction in a state criminal trial is a matter of state law." *Darks v. Mullin*, 327 F.3d 1001, 1008 (10th Cir. 2003). Under Oklahoma law, "[a] trial court must instruct the jury on lesser-included offenses when the lesser-included offense or the defendant's theory of the case is supported by any evidence in the record." *Hooker v. State*, 887 P.2d 1351, 1361 (Okla. Crim. App. 1994). In a homicide case, "the trial court must instruct the jury on every degree of homicide where the evidence would permit the jury rationally to find the accused guilty of the lesser offense and acquit him of the greater." *Malone v. State,* 876 P.2d 707, 711 (Okla. Crim. App. 1994). A jury instruction on second-degree depraved mind murder is warranted only when the evidence "reasonably support[s] the conclusion that the defendant committed an act so imminently dangerous to another person or persons as to evince a state of mind in disregard for human life, *but without the intent of taking the life of any particular individual*." *Jackson v. State*, 146 P.3d 1149, 1160 (Okla. Crim. App. 2006) (emphasis added).

    ii.   <u>OCCA decision</u>

In Mr. Simpson's case, the OCCA analyzed two claims related to the Second Degree Depraved Mind Murder instruction. The OCCA first determined Mr. Simpson was not entitled to the instruction on the merits:

> [Mr. Simpson] argues that an instruction on th[e] lesser offense [of Second Degree Depraved Mind Murder] was warranted because at most, the

83

evidence showed that he simply fired into the car in which [Mr.] Palmer, [Mr.] Jones and [Mr.] Johnson were riding. He asserts . . . there was no evidence that he intended to kill his victims. . . . We find otherwise. In light of the testimony that [Mr. Simpson] threatened to "chop" up [Mr.] Palmer and his companions, instructed [Mr.] Dalton to follow [Mr.] Palmer's car and then shot as many as twenty rounds at the moving vehicle with an assault rifle, we find that the evidence did not reasonably support the conclusion that [Mr. Simpson] did not intend to kill the men in the Chevy. An instruction on Second Degree Depraved Mind Murder was not warranted by the evidence . . . .

*Simpson I*, 230 P.3d at 897.

The OCCA then considered whether Mr. Simpson's counsel was ineffective for failing to request the second-degree murder instruction. The court stated, in relevant part:

[Mr. Simpson] first argues that trial counsel was ineffective for failing to object to . . . the submission of improper jury instructions and verdict forms. These alleged failings concern issues raised and addressed above. . . . We found in Proposition III that an instruction on Second Degree Depraved Mind Murder was not warranted by the evidence. . . . Most of these alleged failings do not reflect a deficient performance by defense counsel and [Mr. Simpson] has not shown a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different.

*Id.* at 904. Despite this language, Mr. Simpson contends "the OCCA did not specifically preclude deficient performance" for a failure to request the second-degree murder instruction. Aplt. Br. at 45.

Mr. Simpson relies on the OCCA's statement that, "[m]ost of these alleged failings do not reflect a deficient performance by defense counsel." *Simpson I*, 230 P.3d at 904. Because the OCCA's use of "most" indicates that some of counsel's performance was deficient, Mr. Simpson claims the failure to request an instruction on second-degree murder falls within that group. We are not convinced.

84

The OCCA's analysis addressed eight alleged failings of counsel, some of which (the admission of hearsay evidence and the failure to object to the HAC Aggravator for Mr. Jones) the court specifically found were error. *Id.* Based on the language quoted above, however, there can be no serious argument that the OCCA found, or even failed to decide whether, counsel was deficient for failing to request an instruction on second-degree murder. *See United States v. Barrett*, 797 F.3d 1207, 1220 (10th Cir. 2015); *Bland v. State*, 4 P.3d 702, 731 (Okla. Crim. App. 2000). The OCCA expressly held "the evidence did not reasonably support the conclusion that [Mr. Simpson] did not intend to kill" the victims. *Simpson I*, 230 P.3d at 897. Thus, the OCCA reasoned a second-degree murder instruction "was not warranted by the evidence" and, as we now explain, it follows that counsel did not render ineffective assistance under *Strickland*. We therefore interpret the OCCA's decision as an adjudication on the merits and afford it AEDPA deference.

### iii.    Merits

Mr. Simpson argues the jury should have been instructed on second-degree depraved mind murder because there was "ample evidence putting the issue of specific intent in question."[39] Aplt. Br. at 45. Again, we disagree.

---

[39] To the extent Mr. Simpson asserts a failure to include this instruction violated his constitutional right under *Beck v. Alabama*, 447 U.S. 625, 635–36 (1980), to have the jury instructed on a lesser-included offense supported by the evidence, his claim fails. First, Mr. Simpson was not granted a COA on this issue and, as such, we do not have jurisdiction to resolve the claim without first issuing a COA ourselves. *See Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 736 (10th Cir. 2016). Second, Mr. Simpson failed to request this instruction at trial and this court has held that a defendant may not prevail on

As the OCCA noted, Mr. Simpson "threatened to 'chop up' [Mr.] Palmer and his companions," *Simpson I*, 230 P.3d at 897, and testimony offered at trial equated "chopping up" with shooting them with an AK-47 rifle. The evidence also showed that Mr. Simpson ordered Mr. Dalton to follow Mr. Palmer's car, and that when Mr. Palmer's vehicle was in range, Mr. Simpson fired as many as twenty rounds into it with an assault rifle. And he did so knowing that three people were in the targeted car. We agree with the OCCA that the evidence presented at trial did not support a second-degree murder instruction because no reasonable jury could have concluded that Mr. Simpson lacked the specific intent to kill.

Trial counsel was not required to request an instruction that was not reasonably supported by the evidence. *See Grissom v. Carpenter*, 902 F.3d 1265, 1291–92 (10th Cir. 2018). Nor is it likely that the trial court would have given such an instruction, even if trial counsel had requested it. *Cf. Delo v. Lashley*, 507 U.S. 272, 275 (1993) ("[W]e have said that to comply with due process state trial courts need to give jury instructions in capital cases only if the evidence so warrants."). Accordingly, we cannot conclude that no

_____

a *Beck*-claim based on an instruction a defendant failed to request. *Grant v. Trammell*, 727 F.3d 1006, 1011–13 (10th Cir. 2013). Finally, even assuming Mr. Simpson presented a proper *Beck* claim, it would fail on the merits because his jury was instructed on both first-degree murder and the lesser-included offense of first-degree manslaughter by misdemeanor. The Supreme Court has held the requirements of *Beck* are satisfied so long as the jury is presented with *any* evidentiary-supported alternative to the "all-or-nothing choice between capital murder and innocence," *Schad v. Arizona*, 501 U.S. 624, 646–47 (1991) (quoting *Spaziano v. Florida*, 468 U.S. 447, 455 (1984)). Despite calling the misdemeanor manslaughter charge "unrealistic," Mr. Simpson concedes that it "technically applied to the evidence at hand." Aplt. Br. at 46.

fairminded jurist would agree with the OCCA that counsel did not perform deficiently by failing to request a jury instruction on second-degree depraved mind murder under the present facts. Thus, the OCCA's adjudication of Mr. Simpson's ineffective assistance of counsel claim was reasonable.

b. *Failure to object to improper prosecutorial arguments*

Next, Mr. Simpson contends his counsel performed deficiently by failing to object to improper prosecutorial arguments.

i. OCCA decision

The OCCA considered this claim together with the ineffective assistance of counsel claim discussed above and stated, in relevant part:

> In Proposition VI, we found that none of the alleged improper comments made by the prosecutor could be found to have affected the jury's finding of guilt or assessment of punishment. . . . Most of these alleged failings do not reflect a deficient performance by defense counsel and [Mr. Simpson] has not shown a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different.

*Simpson I*, 230 P.3d at 904. Like the underlying prosecutorial misconduct claim, the OCCA rejected this claim because Mr. Simpson could not meet the prejudice prong of *Strickland*. This is a decision on the merits, and we review the OCCA's prejudice determination under AEDPA's and *Strickland*'s doubly deferential standard of review. But, because the OCCA did not address the conduct prong, we exercise our discretion to consider de novo whether counsel performed deficiently. *See Hooks II*, 689 F.3d at 1188.

87

ii.     Merits

We held in Section III.D, *supra*, that nearly all of the prosecutorial arguments Mr. Simpson challenges—the Moral Culpability Comments and comments denigrating the evidence in mitigation, comparing the victims' deaths to Mr. Simpson's incarceration, and calling for the death penalty as a civic duty—were improper. Trial counsel made a motion in limine to prohibit prosecutorial argument of this nature, but made no further objection to these improper comments during the sentencing trial. Failing to do so "fell below an objective standard of reasonableness," *see Strickland*, 466 U.S. at 688, and rendered counsel's performance deficient. As we previously concluded, however, the OCCA reasonably determined the misconduct did not deprive Mr. Simpson of a fundamentally fair sentencing trial. Because Mr. Simpson cannot show that he was actually prejudiced by counsel's deficient performance, the OCCA was reasonable in concluding he was not denied effective assistance of counsel. *See Hanson*, 797 F.3d at 837 ("We begin by noting that before [Mr.] Hanson can succeed on his counsel's failure-to-object claims, he must show that the underlying prosecutorial-misconduct claims themselves have merit.").

c. *Failure to object to the "mitigation evidence" jury instruction*

As his next basis for ineffective assistance of counsel related to the failure to preserve the record, Mr. Simpson argues his counsel performed deficiently by failing to object to the jury instruction on mitigation evidence. We again disagree.

i.   OCCA decision

Mr. Simpson raised this claim on direct appeal. The OCCA addressed Mr. Simpson's challenge to the mitigation instruction in its discussion of the constitutionality of the instruction and briefly in its ineffective assistance of counsel analysis. With respect to the constitutionality of the instruction, the OCCA stated:

> In his twelfth proposition, [Mr. Simpson] argues that the definition of mitigating circumstances given to the jury in this case was unconstitutional as it impermissibly limited the jury's consideration of mitigating evidence. This Court has consistently upheld constitutional challenges to the instruction at issue.

*Simpson I*, 230 P.3d at 903. Thus, the OCCA rejected Mr. Simpson's challenge to the mitigation instruction, and we have affirmed that conclusion.

The OCCA also rejected Mr. Simpson's ineffective assistance of counsel claim based on trial counsel's failure to object to that instruction:

> In his thirteenth proposition, [Mr. Simpson] argues that he was denied his Sixth Amendment right to the effective assistance of counsel for several alleged failings of trial counsel. . . . In support of his proposition, [Mr. Simpson] first argues that trial counsel was ineffective for failing to object to . . . the submission of improper jury instructions and verdict forms. These alleged failings concern issues raised and addressed above. . . . In Proposition XII, we found that the jurors' consideration of the evidence offered in mitigation in this case was not unfairly limited. Most of these alleged failings do not reflect a deficient performance by defense counsel and [Mr. Simpson] has not shown a reasonable probability that, but for

89

counsel's alleged unprofessional errors, the result of the proceeding would have been different.

*Id*. at 904.

From this discussion, it is fair to conclude the OCCA found no deficient performance with respect to trial counsel's failure to object to the mitigation instruction. First, the OCCA held the instruction was constitutionally sound, noting it had been repeatedly upheld in the face of challenges. *Id.* at 903. Second, because the mitigation instruction was a correct statement of law, trial counsel did not perform deficiently in failing to object to it. *See Castro v. Ward,* 138 F.3d 810, 830–31 (10th Cir. 1998) (holding counsel is not ineffective for failing to object to mitigation jury instruction that accurately states the law); *see also Northern v. Boatwright,* 594 F.3d 555, 560–61 (7th Cir. 2010) (noting that the jury instruction challenged by the defendant was a correct statement of law and stating, "[o]bviously, an attorney is not constitutionally deficient for failing to lodge a meritless objection"); *Aparicio v. Artuz,* 269 F.3d 78, 99 (2d Cir. 2001) ("[C]ounsel's failure to object to a jury instruction (or to request an additional instruction) constitutes unreasonably deficient performance only when the trial court's instruction contained 'clear and previously identified errors.'" (quoting *Bloomer v. United States*, 162 F.3d 187, 193 (2d Cir. 1998)). Because the OCCA adjudicated Mr. Simpson's claim on the merits, we afford it appropriate deference under AEDPA.

ii.    Merits

In Section III.C, *supra*, we evaluated the merits of Mr. Simpson's challenge to the jury instruction on mitigating evidence and concluded the OCCA acted reasonably in

denying relief because the instruction correctly stated the law. Although we concluded that counsel's failure to object to the prosecutor's misuse of the instruction constituted deficient performance, counsel is not expected to object to legally accurate jury instructions. *See Castro*, 138 F.3d at 830–31. Consequently, Mr. Simpson cannot show that his counsel's performance in failing to object to the instruction "fell below an objective standard of reasonableness," *see Strickland*, 466 U.S. at 688, and the OCCA reasonably determined counsel was not constitutionally ineffective.

d. *Failure to object to the HAC jury instruction*

Finally, Mr. Simpson argues his counsel was ineffective for failing to object to the HAC jury instruction because the instruction "failed to clarify the HAC [A]ggravator was not to be alleged for Anthony Jones." Aplt. Br. at 48. Recall that, although the State did not assert the HAC Aggravator with respect to the murder of Mr. Jones, the jury found it had been proved beyond a reasonable doubt as to the murder of Mr. Palmer and as to the murder of Mr. Jones. Mr. Simpson claims trial counsel could have avoided this confusion by objecting to the instruction for the murder of Mr. Jones, which erroneously listed the HAC Aggravator as an option that could be found unanimously by the jury.[40]

---

[40] The instruction for Count 2, the count related to the murder of Mr. Jones, states:

91

i.    OCCA decision

On direct appeal, the OCCA rejected Mr. Simpson's ineffective assistance of counsel claim based on the HAC instruction. In considering Mr. Simpson's standalone, non-ineffective-assistance-of-counsel challenge to the HAC Aggravator as to Mr. Jones's death, the OCCA concluded the challenge was "well taken" and struck the aggravator. *Simpson I*, 230 P.3d at 903. The OCCA, however, denied relief on the non-ineffective-assistance-of-counsel claim because the State did not present any evidence on the aggravator as to Mr. Jones such that the "the jury's weighing process of mitigating evidence against aggravating circumstances was not skewed." *Id*. In essence, the OCCA concluded that while an error occurred, the error did not prejudice Mr. Simpson.

---

We, the jury, empaneled and sworn in the above entitled cause, do upon our oaths unanimously find the following statutory aggravating circumstance[] or circumstances as shown by the circumstance or circumstances checked:

\_\_\_\_        The defendant, prior to this sentencing proceeding, was convicted of a felony involving the use or threat of violence to the person;

\_\_\_\_        During the commission of the murder, the defendant knowingly created a great risk of death to more than one person;

\_\_\_\_        The murder was especially heinous, atrocious, or cruel;

\_\_\_\_        At the present time there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

Trial R. vol. 3 at 585; *see also id.* at 530 (identify Count 2 being as to the murder of Mr. Jones). The jury checked all four aggravators.

When the OCCA reached Mr. Simpson's ineffective assistance of counsel claim relative to the jury instruction on the HAC Aggravator, it stated:

> [W]e found that the heinous, atrocious or cruel aggravating circumstance was proven beyond a reasonable doubt as to the murder of Glen Palmer. Although this aggravating circumstance was stricken as to the murder of Anthony Jones, [Mr. Simpson's] jury did not consider improper aggravating evidence in deciding punishment. . . . Most of these alleged failings do not reflect a deficient performance by defense counsel and [Mr. Simpson] has not shown a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different.

*Id.* at 904. Before this court, Mr. Simpson acknowledges that the OCCA's holding on his ineffective assistance of counsel argument relevant to the HAC Aggravator as to Mr. Jones's "did not preclude deficient performance." Aplt. Br. at 49. Rather, the OCCA determined Mr. Simpson was not prejudiced by the seemingly deficient performance with respect to the HAC instruction and denied relief on this claim based on the second prong of *Strickland*. *Id.*

ii.   Merits

Because the OCCA rejected Mr. Simpson's ineffective assistance of counsel claim on the merits, we afford its decision deference under § 2254(d). We conclude the OCCA did not act unreasonably in rejecting Mr. Simpson's claim. We have already determined that the instruction was a correct statement of Oklahoma law, and the OCCA struck the aggravator as to Mr. Jones. Because there was no evidence introduced solely to support the HAC Aggravator, we cannot conclude that the OCCA's decision that Mr. Simpson

93

was not prejudiced was unreasonable. Accordingly, we deny Mr. Simpson relief on this claim.

### G. *Cumulative Error*

Mr. Simpson's final claim is that even if the individual errors in his trial do not warrant relief, their cumulative impact denied him a fundamentally fair trial and sentencing proceeding. We address this claim in three sections. First, we discuss the relevant legal background. Next, we review the OCCA's decision, taking note of the errors it included in its analysis. Finally, having found no errors the OCCA did not include in its analysis, we review the reasonableness of its decision under AEDPA's deferential standard of review. Ultimately, we conclude the OCCA's decision was reasonable, and we deny Mr. Simpson relief on this claim.

### 1. Legal Background

"Cumulative error analysis is an extension of harmless error and conducts the same inquiry as for individual error, focusing on the underlying fairness of the trial." *Darks*, 327 F.3d at 1018 (internal quotation marks and citations omitted). This analysis "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Toles,* 297 F.3d 959, 972 (10th Cir. 2002) (internal quotation marks omitted). Only actual constitutional errors are considered when reviewing a case for cumulative error. *See Jackson v. Warrior*, 805 F.3d 940, 955 (10th Cir. 2015) ("[C]umulative-error in the federal habeas context applies only where there are

94

two or more actual constitutional errors." (quotation marks omitted)); *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) (en banc) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."). To determine the harmlessness of the cumulative error, "courts look to see whether the defendant's substantial rights were affected." *Rivera*, 900 F.2d at 1470; *see also Darks*, 327 F.3d at 1018. A defendant's substantial rights are affected when "the cumulative effect of the errors . . . had a 'substantial and injurious effect or influence in determining the jury's [sentence].'" *See Hanson*, 797 F.3d at 852 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

## 2. OCCA Decision

On direct appeal, the OCCA denied Mr. Simpson relief on his cumulative error claim, concluding that, "[a]ny errors were harmless beyond a reasonable doubt, individually and cumulatively." *Simpson I*, 230 P.3d at 906. This is a decision on the merits, and we are bound by the OCCA's cumulative error determination unless it is contrary to or an unreasonable application of the cumulative error doctrine. *See Hanson*, 797 F.3d at 852 ("Because the OCCA considered the merits of the cumulative error claim, we review its decision through the deferential lens of AEDPA."); *Thornburg*, 422 F.3d at 1137 ("We must defer to [the OCCA's cumulative error] ruling unless it constitutes an unreasonable application of the cumulative-error doctrine.").

### 3. Merits

Upon reviewing Mr. Simpson's claims, we, like the OCCA, have identified four

sentencing-stage errors that do not individually entitle Mr. Simpson to habeas relief: (1)

prosecutorial misconduct; (2) counsel's deficient performance in failing to investigate

and present further mitigating evidence regarding Mr. Simpson's upbringing;[41] (3)

counsel's deficient performance in failing to object to the prosecutorial misconduct; and

(4) counsel's deficient performance in failing to object the HAC Aggravator jury

instruction.[42]

---

[41] Where we presume deficient performance for purposes of the first prong of an ineffective assistance of counsel claim but reject the claim on the prejudice prong, we include the assumed error in our cumulative error analysis. *See Grant v. Royal*, 886 F.3d 874, 954–55 (10th Cir. 2018), *petition for cert. filed sub nom. Grant v. Carpenter*, No. 18-6713 (Nov. 13, 2018).

[42] Mr. Simpson argues we should also include the harmless errors identified by the OCCA in our cumulative error analysis, specifically the invalidation of the HAC Aggravator as to the murder of Mr. Jones and the admission of hearsay evidence by Mr. Collins. But the Order granting COA authorizes Mr. Simpson to raise "cumulative error, *limited to errors in the grounds on which a Certificate of Appealability has been granted*." Case Management Order at 2, dated December 1, 2016 (emphasis added). Neither the district court nor this court issued a Certificate of Appealability on Mr. Simpson's claims related to invalidation of the HAC aggravator as to Mr. Jones or the hearsay testimony of Mr. Collins. And Mr. Simpson has not moved to modify the COA to include these claims. Notwithstanding that omission, we have recognized that cumulative error review requires the aggregation of all constitutional errors found to be harmless and any "substantive errors . . . individually determined not to warrant habeas relief because of a lack of sufficient prejudice under substantive constitutional standards." *Cargle v. Mullin,* 317 F.3d 1196, 1220 (10th Cir. 2003). As a result, the limitation in the Order granting COA may be inappropriately narrow. We need not resolve this question, however, because neither of the errors identified by the OCCA are constitutional errors.

First, with respect to the jury's finding of the HAC Aggravator as to the murder of Mr. Jones, the OCCA concluded there was no constitutional error because the jury "did not consider improper aggravating evidence in deciding punishment." *Simpson I*, 230

We now determine their cumulative impact. *See Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003) (holding prosecutorial misconduct and deficient performance by counsel "should be included in the cumulative-error calculus if they have been individually denied for insufficient prejudice"). All the identified errors occurred at the sentencing stage of the trial; therefore, we review whether the errors "rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case." *Thornburg*, 422 F.3d at 1137 (internal quotation marks omitted).

The OCCA held the cumulative effect of these errors was "harmless beyond a reasonable doubt." *See Simpson I*, 230 P.3d at 906. Under AEDPA's deferential standard of review, we cannot conclude that no reasonable jurist would agree with that assessment. Despite the identified errors, the jury was presented with copious amounts of aggravating evidence, overwhelming evidence of guilt, and proper instructions from the trial court. Recall that Mr. Simpson pursued the victims in response to an altercation that occurred over an hour earlier and did so armed with an assault rifle. When Mr. Simpson's vehicle

---

P.3d at 903. Under these circumstances, the invalidation of the HAC Aggravator does not inform our cumulative error analysis. *See Hanson v. Sherrod*, 797 F.3d 810, 848–49, 853 (10th Cir. 2015) (excluding the invalidation of an aggravating sentencing factor from its cumulative error analysis where all the evidence admitted under the invalidated aggravator was properly admissible under other valid aggravators).

Second, the OCCA agreed with Mr. Simpson that five letters written by Mr. Collins and introduced at trial "were hearsay for which no exception applied." *Simpson I*, 230 P.3d at 898. But importantly for our purposes, the OCCA rejected Mr. Simpson's argument that admission of the letters violated his Sixth Amendment right to confrontation because "[Mr.] Collins testified at trial and was subject to cross examination." *Id.* at 899; *see id.* at 906.

97

drew abreast of the victim's car, he fired up to twenty rounds into that car, killing two of the passengers and severely wounding the other. Before leaving the scene, Mr. Simpson announced, "I'm a monster. I'm a motherfucking monster. Bitches don't want to play with me." Trial Tr. vol. 4 at 44–46. He then proceeded with his plans to rendezvous with some women he had met earlier at a club. The evidence also revealed that Mr. Simpson had previously been convicted of an armed home invasion, during which he shot the victim in the head.

Under these circumstances, the OCCA's cumulative error analysis is not unreasonable, and Mr. Simpson is not entitled to habeas relief as to his death sentences.[43]

## IV.    CONCLUSION

We AFFIRM the district court's denial of federal habeas relief under 28 U.S.C. § 2254 as to Mr. Simpson's convictions in the guilt stage of his trial and as to his death sentences. We DENY Mr. Simpson's motion for modification of his COA.

---

[43] Mr. Simpson also raises a cumulative error claim as to his convictions. Having found no error related to the guilt stage of Mr. Simpson's trial, there is nothing to cumulate, and we deny this claim. *See Hanson*, 797 F.3d at 853 ("[W]e cannot engage in a cumulative error analysis absent at least two errors.").